1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                      DALLAS DIVISION

4
   UNITED STATES OF AMERICA,     )        3:15-CR-256-K
5            Government,         )
                                 )
6                                )
   VS.                           )        DALLAS, TEXAS
7                                )
                                 )
8  BILAL ABOOD,                  )
            Defendant.           )        May 25, 2016
9

10            TRANSCRIPT OF SENTENCING HEARING

11          BEFORE THE HONORABLE ED KINKEADE

12             UNITED STATES DISTRICT JUDGE

13

14

15  A P P E A R A N C E S:

16

17  FOR THE GOVERNMENT:        MR. J. MARK PENLEY
                               UNITED STATES DEPARTMENT OF JUSTICE
18                             NORTHERN DISTRICT OF TEXAS
                               U.S. Courthouse, Third Floor
19                             1100 Commerce Street
                               Dallas, Texas  75242
20                             mark.penley@usdoj.gov
                               (214) 659-8600
21

22

23

24

25

```
 1   FOR THE DEFENDANT:          MR. HEATH ENIX HYDE
                                 Law Office of Heath Hyde
 2                               214 Connally Street, Suite A
                                 Sulphur Springs, Texas  75482
 3                               heathhyde@sbcglobal.net
                                 (903) 439-0000
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19   COURT REPORTER:            MR. TODD ANDERSON, RMR, CRR
                                 United States Court Reporter
20                               1100 Commerce St., Rm. 1625
                                 Dallas, Texas  75242
21                               (214) 753-2170

22

23           Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

SENTENCING HEARING - MAY 25, 2016

**P R O C E E D I N G S**

1          THE COURT:  All right.  Case of the United States of
2     America versus Bilal Abood, Cause Number 3:15-CR-256-K.

3          Mr. Mark Penley is here for the Government, and
4     you're ready, aren't you, sir?

5          MR. PENLEY:  Yes, Your Honor.

6          THE COURT:  And Mr. Heath Hyde is here for the
7     Defendant, and you're ready?

8          MR. HYDE:  We're ready, Your Honor.

9          THE COURT:  Okay.

10          (Pause)

11          THE COURT:  Mr. Abood, on October 13, 2015, you pled
12     guilty before United States Magistrate Judge Irma Ramirez to a
13     one-count superseding indictment that had been filed on
14     July 21, 2015.  What you pled guilty to was making a false
15     statement to a federal agency.

16          I accepted your guilty plea on October 28, 2015.  And
17     as part of the plea bargain I'll dismiss the original
18     indictment today.

19          We've got an offense level 29, criminal history
20     category VI, with a -- is the range just flat 96 months or
21     what?  That's the cap?

22          MR. PENLEY:  That's the cap --

23          THE COURT:  That's the cap.

1          MR. PENLEY:  -- under the statute.

2          THE COURT:  Okay.

3          MR. PENLEY:  And, Your Honor, the statute is Section

4     1001, which ordinarily is a five-year cap, but because this

5     case involves international terrorism -- and that's our

6     position, it's not the Defendant's, but it's ours -- then the

7     cap is eight years.

8          So 96 months is the statutory max if you agree with

9     Probation that the international terrorism enhancement --

10          THE COURT:  Should be added onto it?

11          MR. PENLEY:  That's really the issue here, Judge.

12          THE COURT:  And is that statutory or is that

13     guideline?

14          MR. PENLEY:  Well, it's both.  I mean, the statute

15     does contain the increased ceiling of eight years.

16          THE COURT:  It does?

17          MR. PENLEY:  If it meets the definition of

18     international terrorism under Section 2331.

19          THE COURT:  I get it.

20          MR. PENLEY:  And the guideline, which is 3A1.4, says

21     if the offense is a felony that involved or was intended to

22     promote a federal crime of terrorism, then you get the

23     enhancement.

24          THE COURT:  Okay.  So it's both?

25          MR. PENLEY:  It goes to a level 32.

1          THE COURT:  Okay.  Okay.

2          MR. PENLEY:  So because the guideline range of 151 to

3  188 is more than 96, 96 is the guideline sentence pursuant to

4  the PSR.

5          THE COURT:  I get it.

6          Oh, okay.  Because 96 is the cap of the statute?

7          MR. PENLEY:  Exactly, Your Honor.

8          THE COURT:  I get it.  I get it.

9          MR. PENLEY:  It's lower than the guideline range.

10          THE COURT:  Thank you.  Thanks for making that clear.

11  I appreciate it.

12          And there's no objections to the presentence report

13  by either side.

14          Is that right, Mr. Hyde?

15          MR. HYDE:  That's correct.

16          MR. PENLEY:  Correct, Your Honor.

17          THE COURT:  All right.  So I accept the findings of

18  the Probation Department as the findings of the Court.

19          I will leave open this idea of whether or not

20  terrorism applies, so I'll think about that.  And so I leave

21  that open whether I'm agreeing with that by the Probation

22  Department.  So that part is still open.

23          All right.  I'm ready to hear anything you have in

24  mitigation, Mr. Hyde.

25          MR. HYDE:  Okay, Your Honor.  Obviously, I gave a

 1  memorandum --

 2          THE COURT:  I do have that.

 3          MR. HYDE:  -- in aid of sentencing.

 4          THE COURT:  You don't have to go over that, but,

 5  obviously, I've got that here.

 6          MR. HYDE:  And, obviously, our view is, is that

 7  Mr. Abood accepts responsibility for giving a false statement

 8  to an FBI agent, but I will call it the fifth prong here of

 9  1003 of being a material false statement involving

10  international terrorism.  I don't believe that what he lied

11  about reaches that level as I stated in my memorandum.  I'm

12  prepared this morning to call Mr. Abood to kind of explain what

13  was going on.

14          You know, before calling him, as I stated in the memo

15  in regards to what the law has suggested was material in

16  regards to international terrorism and what acts have to do and

17  accomplish.  And I don't believe his Tweet in this case reached

18  that level.

19          And in addition to that, I think it's important that

20  they interviewed him numerous times.  They ultimately came and

21  got a search warrant from his computer and then after that

22  waited another nine months before coming and making any type of

23  arrest to put him in custody, which I think strongly suggests

24  the level of threat that they considered Mr. Abood.

25          But I think Mr. Abood has a unique story once you

 1   hear it and kind of make sense of how this kind of all falls in
 2   line.
 3             THE COURT:  Okay.  Do you want to call him right now?
 4             MR. HYDE:  Yes, sir.
 5             THE COURT:  All right.  You need to be sworn in, sir.
 6             THE CLERK:  Raise your right hand.
 7             THE COURT:  Go ahead.
 8                   BILAL ABOOD, DEFENDANT, SWORN
 9                        DIRECT EXAMINATION
10   BY MR. HYDE:
11   Q.   If you would introduce yourself to the Judge.
12   A.   My name is Bilal Abood.
13             THE COURT:  Why don't you get in front of the
14   microphone.  I can hear Mr. Hyde just fine.
15   A.   My name, Bilal Abood.
16   Q.   And, Bilal, where were you born?
17   A.   Born in Iraq, Baghdad.
18   Q.   Okay.
19             THE COURT:  What was the last?  Iraq, what town?
20             THE DEFENDANT:  Baghdad.  Baghdad.
21             THE COURT:  In Baghdad?
22             THE DEFENDANT:  Yes, sir, the capital.
23   BY MR. HYDE:
24   Q.   And how old are you, Bilal?
25   A.   38.  19 -- I mean 38.

1    Q.   Okay.  And you're very nervous, aren't you?

2    A.   Yes, sir.

3    Q.   Okay.  Just relax and answer the questions the best you

4    can so the Judge can understand you, okay?

5    A.   Yes, sir.

6    Q.   All right.  How did you become connected or involved with

7    the United States military?

8    A.   Sir, when the first U.S. troops came to Baghdad --

9              THE COURT:  What year was that?

10             THE DEFENDANT:  That was 2003.  April 9th, the 9th,

11   2003.

12   A.   The regime, the old regime, the dictator regime, they had

13   used the school, the children's schools as cache.  They stored

14   weapons in it.

15             And once the troops came to Baghdad, it was only the

16   Marines and the Special Forces.  So a team of the Special

17   Forces reached our city.  And as we never seen troops, we all,

18   like the neighborhood, as kids and grown men, we were, you

19   know, around them and start talking to them.

20             So me and my friend, we actually told them that there

21   is actually a weapon that is being stored by the Government as

22   a cache.  They put it in the school, you know, so no one -- no

23   one knows, you know, because they know that Air Force would not

24   target children's schools.

25             THE COURT:  Okay.

1   A.   So when we did that, sir, they offer my friend -- he speak

2   better than me English, and he used to live here.  They offered

3   him a job to work with him -- with them.

4           And from there, after he worked, I was working.

5   Like, a week later I start working with them in Baghdad, in

6   Daura refinery -- that's in Baghdad -- with Special Forces.

7   Q.   And how long did you work for -- with the military in

8   Iraq, in Baghdad?

9   A.   All in general or just with the Special Forces?

10  Q.   Broader.

11  A.   Okay.  Okay.  I worked with the Special Forces for like

12  three months.  And the reason why I quit, there was bad people

13  that we don't know, because when they -- the troops came first,

14  we don't know what really -- what the feeling of other people.

15  So we were actually --

16          THE COURT:  Are you Shia or Sunni?

17          THE DEFENDANT:  Sunni, sir.

18          THE COURT:  I'm trying to remember.  Was -- Saddam

19  Hussein was Sunni, correct?

20          THE DEFENDANT:  Right.  Yes, sir.

21          THE COURT:  So then -- but there's more Shias than

22  there are Sunnis in Iraq, correct?

23          THE DEFENDANT:  No, sir, it's not correct.  If you

24  count -- if you count Sunnis, the Arab Sunnis and the Kurd,

25  because the Kurd the majority are Sunnis, then the Sunnis would

1    be more than the Shia.

2             THE COURT:  Okay.  In Iraq?

3             THE DEFENDANT:  In Iraq, yes, sir.

4             THE COURT:  Okay.

5    BY MR. HYDE:

6    Q.   Your total service with the U.S. military was how long, as

7    far as in Iraq?

8    A.   Okay.  As far as in Iraq, I worked for the U.S. Forces --

9    I mean Special Forces for three months, and I had to leave the

10   country because my friend was beheaded, was killed.  And I

11   was --

12            THE COURT:  By?

13            THE DEFENDANT:  Huh?

14            THE COURT:  By?

15            THE DEFENDANT:  By terrorists, by people.  They were

16   chasing us.  Because the Special Forces gave us a uniform, like

17   a red shirt and khaki jeans.  And we were actually openly

18   telling everyone we're not aware enough what's going on.  We

19   don't know.  People -- we think everyone should be happy

20   because here they come and they liberate us from a dictator,

21   but we didn't know he have -- still have followers and people

22   that didn't like it.  So he was killed.

23            Then two days later I received -- we have big garage

24   in our house.  I received a letter, a folder with a brass

25   shield of the bullet in that folder, just like a letter.  And

1   when I -- when I saw that, even my family says, hey, you have

2   to leave because that's basically threat.  That's just telling

3   you you're next.

4           So I had to leave from 2003.  I left my daughter.

5   She's like three years at the time.  And stayed out like three

6   years, trouble and all, like many -- many countries.

7           In 2006, I went back, but I didn't go back to Iraq --

8   I mean to Baghdad.  I couldn't go there because it's a risk for

9   my life and my family.  And I went to Kirkuk.  It's north of

10  Iraq.  And I applied again --

11          THE COURT:  What town is that?

12          THE DEFENDANT:  Kirkuk.  It's --

13          THE COURT:  Kirkuk?

14          THE DEFENDANT:  Yeah, Kirkuk.

15          THE COURT:  K-I-R-K-U-K?

16          THE DEFENDANT:  I'm sorry, my pronunciation --

17          THE COURT:  That's okay.

18          THE DEFENDANT:  My language, sir.

19          THE COURT:  It's okay.

20          THE DEFENDANT:  So I went there, and I start working

21  with Army as interpreter from 2000 -- I'm sorry, my mouth is

22  dry -- from 2000 -- 2006.

23          THE COURT:  Excuse me.  There's water right there.

24          MR. HYDE:  Oh.

25          THE DEFENDANT:  Thank you, sir.

```
 1              THE COURT:  I don't know if there's any water in it
 2    today or not.  Is there?  No.  Here.  Here you go.  They don't
 3    do that anymore, so you can have my bottle of water.
 4              (Pause)
 5              MR. HYDE:  Thank you.
 6              THE COURT:  You bet.
 7              THE DEFENDANT:  Thank you, sir.
 8              So I went working with the -- with the Army.
 9    Actually, it was a big Air Force base in Kirkuk, but I had to
10    go work in a very dangerous area, which is Hiwijah.  It's
11    still -- still in the province of Kirkuk, but it's very, very
12    bad area.  And --
13              THE COURT:  What's the name of it?
14              THE DEFENDANT:  Hiwijah.  Hiwijah.
15              THE COURT:  How do you spell that?
16              THE DEFENDANT:  H-I-W-I-G-A-H -- J-A-H.  It was -- it
17    was -- I work there.  It was battalion base.  A battalion
18    infantry base.  I worked there with 101st.  Commander was
19    Colonel Meyerowich.  As well, he was a brigade commander in --
20    I met him in Fort Jackson, South Carolina, when I went to basic
21    training.  And I worked with the 10th Mountain, and I worked
22    with --
23    BY MR. HYDE:
24    Q.   And what did you do for them?
25    A.   I was -- I was interpreter there.  I was working with the
```

1   infantry.  We were going outside and do missions, chasing the

2   terrorists, arrest them, and helped as well the people.

3          And I also worked for long time with the civil

4   affairs.  That's basically what I love there.  It's -- we were

5   helping people, building projects, schools, a lot of things to

6   help poor people there.

7   Q.   And as a result of that, were you granted -- as your work

8   were you granted citizenship to the United States?

9   A.   As a result of that, the Army brought me here and -- yes,

10  sir.

11  Q.   And where did they bring you in the United States?

12  A.   They brought me to Texas.

13  Q.   Okay.  And what did you do for them?

14  A.   I -- after I came here, just -- it only took me four

15  months.  I had to go online and educate myself a little bit

16  more so I can pass the ASVAB test.  And I went and joined the

17  Army.

18          But even before I joined the Army, I actually worked

19  with AF -- AFC.  It's American Federal Contractor.  It's in

20  Louisiana, Fort Polk.  I went there and start working for that

21  company to train the soldiers before they get deployed in Iraq

22  to lecture them about the traditions and culture there, how

23  they deal with women, how they deal with men, old men, this and

24  that.  And as well, we trained them how to go and search and do

25  a lot of things and how to work with the interpreters, with the

1    local governments.  We -- and I did this like ten -- I mean

2    three years.  I believe 2009, 2010, and 2011 with American

3    Federal Contractor.  And I joined the Army as well in 2010.

4    Q.   And at some point did you leave the military?

5    A.   Yes, sir.

6          Everyone have leave, a year.  Every soldier or any

7    military personnel have leave a year.  They can take a leave.

8    And what I saw, we were -- in our company, all of us are

9    linguists.  So other linguists, they got their leave.  They

10   went to see their families, one of them in Morocco, one of them

11   in Egypt.  They went and see.

12         When I asked for my leave, they surprised me by

13   saying Iraq and certain countries are -- of military personnel

14   while he's in the service he cannot go there.  It's on black

15   list.

16         So at that time I wanted to go there because my mom

17   was so, so sick.  And she still -- she still have heart

18   problems.  And she wanted me to come.  And I wanted very bad to

19   go there.  And I was crying.  So I had to leave.  I had to

20   leave.

21   Q.   So as a result, in order for you to go to Iraq, you had to

22   resign from the military?

23   A.   Yes, sir.  Yes, sir.  That's the only way to go.  We -- as

24   military personnel you cannot go to Iraq.

25   Q.   So you resigned.  Did you go to Iraq and see your family?

1    A.   Yes, sir.

2    Q.   Okay.  At some point did you come back to the United

3    States?

4    A.   Yes, sir.

5    Q.   And when did you come back?

6    A.   I came back -- I went there for a week.  I came back

7    same -- same year.

8    Q.   Okay.

9    A.   Yeah.

10   Q.   And what did you do when you came back to the United

11   States?

12            THE COURT:  What year was that?

13            THE DEFENDANT:  2000 -- 2000 -- I'm not too sure.

14   2011 or 2012.

15            THE COURT:  Okay.

16            THE DEFENDANT:  Yes.  I'm not sure when that.

17   BY MR. HYDE:

18   Q.   It's okay.

19            What did you do when you got back to the United

20   States?

21   A.   I already -- I already have -- I had a job.  I had two

22   jobs.  Because I had to wait a little bit.  And then, I mean, I

23   had two jobs.  I was working UPS and working as security with a

24   company called Securitas at Coca-Cola.

25   Q.   And so you were working two jobs when you were here?

```
 1   A.   Yes, sir.

 2   Q.   Okay.

 3   A.   Yes.  I was working two jobs to try to help my mother.

 4   And I don't want her to be -- when she get old to be in need to

 5   anyone, so I really worked very hard.  I even injured my back

 6   so I can buy her a house, and I did.

 7   Q.   And at some point -- and that leads us into a point.  At

 8   some point as a result of working did you wire money to Iraq to

 9   your mother?

10   A.   Yes, sir.  Yes, sir.

11   Q.   And how much money did you wire to your family?

12   A.   See, I wired $80,000.00, but I maybe wired more, but for

13   the house $80,000.00.  That's what I remember.  But before

14   that, probably I wired $500.00 to my uncle.  He was in need.

15   Something here and there.  But $80,000.00, that was for the

16   house.

17            THE COURT:  Are you saying $8,000.00?

18            THE DEFENDANT:  No, sir.  $80,000.00.  And I did it

19   with my bank, with Wells Fargo.

20            THE COURT:  Okay.  Where did you get $80,000.00?

21            THE DEFENDANT:  I worked very hard.  I worked for the

22   military, and I worked two jobs for almost three years, at UPS

23   and security.  I was working almost 15 hours or 16 hours a day,

24   seven days a week.  I didn't even take my leaves.

25            THE COURT:  Okay.
```

1   BY MR. HYDE:

2   Q.   And you had paperwork, and that paperwork was presented to

3   the Government and everything.  There was no secrets about

4   that?

5   A.   No, no, no.  There's a paper.  I even took it with me.  I

6   even took it with me at the airport.  I showed it to them.  And

7   that's all I do.  I do it through Wells Fargo.  If you go back

8   to Wells Fargo, you see all that money, where it comes from.

9   Q.   But, regardless, on March the 29th of 2013, you tried to

10  go back to Iraq and you were told that you were not able to

11  fly; is that correct?

12  A.   Right.

13  Q.   And you do not know even today why you were prevented from

14  flying; is that correct?

15  A.   Yes, sir.  I mean --

16          THE COURT:  Wait minute.  Did you go back to Iraq for

17  a week?  I thought you did.

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Okay.  I'm missing out.

20          MR. HYDE:  I'm sorry.  He went back to Iraq and saw

21  his family.

22          THE DEFENDANT:  Yeah.

23          MR. HYDE:  He comes back to the United States and is

24  working, has been working there.  And then he decides to go

25  back to Iraq, and they tell him he can't fly.

```
 1                THE COURT:  A second time?

 2                MR. HYDE:  Yes.

 3                THE COURT:  Okay.

 4   BY MR. HYDE:

 5   Q.   And that's March the 29th of 2013?

 6   A.   Yeah.

 7                THE COURT:  Okay.

 8   BY MR. HYDE:

 9   Q.   Okay.  Then at that point, April the 4th, 2013, you were

10   interviewed by federal agents; is that correct?

11   A.   I was interviewed, yeah, by the federal agents in Mesquite

12   Police Station.

13   Q.   Okay.  And did you indicate to them at that time you were

14   also wanting to go to Syria?

15   A.   Yes, sir.

16   Q.   Okay.

17   A.   Yes, sir.

18   Q.   And they continued to ask you questions about going to

19   Syria; is that correct?

20   A.   Actually, they asked me to work for them.  Actually, the

21   special agent, Mexican background, he actually asked me to work

22   for them.  Yes, they asked me.  And even he advised me, told

23   me, because he was in my bag, duffle bag, he said, "I would

24   advise you don't even take your military uniform.  You can't

25   even go.  You see the Free Syrian Army.  You can't even go and
```

```
 1   fight with your jeans and shirt."
 2            And that's when -- that's what they asked me,
 3   actually, and then they took me to the hotel.  And they asked
 4   me they might hire me and actually train me.  And if I -- if
 5   that happened, they would teach me how to contact them.  And I
 6   have to stay there.  Exactly that's what -- his word, "You
 7   might have to get out of Syria every three months, go to the
 8   U.S. Embassy in Istanbul to meet our contact there.  And we
 9   will teach you how to -- so you won't get caught," this and
10   that.
11   Q.   And during this time, part of the time you were held up at
12   a hotel.  It was four to five days --
13   A.   Right.
14   Q.   -- that they kept you there, correct?
15   A.   Yes.
16   Q.   Okay.
17            THE COURT:  Hotel where?
18            THE DEFENDANT:  It's in Dallas, but I really don't
19   remember, sir.
20            THE COURT:  Okay.
21   BY MR. HYDE:
22   Q.   Okay.  But ultimately --
23            THE COURT:  Do you have any proof, any receipts,
24   anything like that?
25            MR. HYDE:  He wasn't the one renting the room.
```

1    BY MR. HYDE:

2    Q.   You weren't the one renting the room?

3    A.   No.  They rented for me, yes.

4    Q.   Okay.

5            THE COURT:  What was name of the agent?

6            THE DEFENDANT:  I know one of them.  His name, Ryan

7    Lawrence.

8            THE COURT:  His name is what?

9            THE DEFENDANT:  Ryan Lawrence.

10           THE COURT:  Lawrence?

11           THE DEFENDANT:  Yes.

12   BY MR. HYDE:

13   Q.   But, ultimately, in your discussions with them about going

14   to work, y'all could not reach an agreement as far as payment

15   or type of payment; is that correct?

16   A.   Yes.  It was -- it was actually -- they said, "We can pay

17   you cash."

18           So I'm like, "You want to pay me cash, but what if

19   something happen to me?  And just to be honest, something

20   happen to me and then y'all say, 'Oh, we don't know him.  We --

21   we -- he's not working for us,' this and that."

22           So I'm like, "No, I want to be officially working for

23   you, that something can prove that I'm receiving money from

24   you.  That's cash money.  I don't -- I need to" --

25           So they said, "Okay.  We will be back.  We're going

1  to talk to our sister department," which is the CIA.

2         And I said, "Okay.  I'm ready to work.  I'm ready --

3  I served my country, and I'm ready to do it again."

4         And so they went back.  They came back, and they

5  said, "Well, we -- we can't hire you.  We can pay you cash, but

6  we can't hire you that way."

7  Q.  And so the Judge understands in regards to -- about what

8  we're getting into as far as tweets with ISIS and you being a

9  Sunni and what was going on in Syria, why were you wanting to

10  go to Syria?

11  A.  Sir, when the -- in the beginning it was -- it was what

12  they called Arab Spring.  When it start, it started I believe

13  in Tunisia.  And so the whole Arab nation world was watching

14  what was going on through the media.

15         THE COURT:  What year is this?

16         MR. HYDE:  2013.

17         THE COURT:  '13?

18         MR. HYDE:  (Indicating in the affirmative)

19         THE DEFENDANT:  Actually, no, that's --

20  BY MR. HYDE:

21  Q.  But that's the time that you're interested in as far as

22  going to Syria?

23  A.  Oh, oh, yeah.  I'm trying to get to that point.

24         So when -- after what happened with the dictator

25  Gaddafi, I even wanted to go with the Navy to work for them as

1    an interpreter at that time, but they said no, no ground

2    troops.

3            So when Syria revolution happened, the Syrian people

4    were posting all the time on YouTube, Facebook, everywhere on

5    the media, showing the whole world what was going on.  And when

6    I see -- when I see a child get shot to death by a chemical and

7    I see a woman drug by her hair all the way to a car and get

8    raped by a soldier, dictator soldiers, these --

9            THE COURT:  Which dictator was that?

10           THE DEFENDANT:  Huh?

11           THE COURT:  Which dictator?

12           THE DEFENDANT:  Dictator is -- I'm sorry, sir.

13           THE COURT:  In Syria?

14           THE DEFENDANT:  Yes, sir.  It's Bashard, yes.

15           THE COURT:  You're talking about Assad?

16           THE WITNESS:  Assad, yes, sir.

17   BY MR. HYDE:

18   Q.   And so that the Judge is clear, has the Sunni and

19   Shiite --

20           THE COURT:  So is this during the period of time when

21   the President of the United States says, "Oh, there's this red

22   line that I'm not going to let anybody cross"?  And then, of

23   course, he didn't follow up on that.  That was not true.  And

24   everybody crossed it in Syria.  Do you remember that, when the

25   President said that?

1          THE DEFENDANT:  The chemical weapons.  That's the

2     one.

3          THE COURT:  He said, "If anybody crosses this line,

4     we're going to stop it."

5          THE DEFENDANT:  Yes.  Right.  Right, sir.

6          THE COURT:  We didn't do anything.  America didn't do

7     anything.

8          THE DEFENDANT:  No.

9          THE COURT:  Remember that?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  And there was some movement among the CIA

12     and other operatives, is my understanding, to try to find some

13     friendly Mujahideen -- I don't know what you call them --

14          THE DEFENDANT:  Right.

15          THE COURT:  -- to fight both against Assad and

16     against ISIS.  It's really kind of before ISIS really became

17     known.

18          THE DEFENDANT:  Yeah, but that -- that -- what

19     happened, even after I went and came back.  Because when I was

20     there, ISIS is never -- they were never even there.

21          THE COURT:  ISIS wasn't a --

22          THE DEFENDANT:  Wasn't even there.

23          THE COURT:  That didn't happen yet, right?

24          THE DEFENDANT:  No, no, they not there.  They was not

25     there.  They came after, by the end of 2013 or by the end of --

1          THE COURT:  So this is before ISIS?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Right?

4          THE DEFENDANT:  Yes, before.

5          THE COURT:  And there were -- I don't know what you

6    would call them.  What would you call them?  Freedom Fighters?

7          THE DEFENDANT:  They were Free Syrian Army and

8    Freedom Fighter, yes.  That's what we were --

9          THE COURT:  Some of the people in the Syrian Army

10   wanted to kill Assad --

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  -- or get him deposed?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Kick him out and all that, right?

15         THE DEFENDANT:  Yes, sir.  And that's -- that's

16   exactly the people that I contacted with and talked to.  And I

17   even gave them -- the FBI their phone numbers, their names.

18   And we made the phone calls to them as well.

19         THE COURT:  Then what happened?

20         THE DEFENDANT:  So when that -- when that happened,

21   you know, as a human being, as I've been taught, I could not --

22   sir, I could not turn my face seeing child or woman get hurt.

23   BY MR. HYDE:

24   Q.  So you went to Syria?

25   A.  Yes, sir.  I went -- I went -- after that happened, I was

1   actually waiting, and they said, "We can help you to fly.

2   We're going to help you, take you out of no-fly list and help

3   you to fly."

4           So I waited like a whole month, saying next week,

5   next week, next week.

6           So, eventually, I had to go.  And I had to go --

7   because I can't fly from here, I had to go to Mexico and fly

8   from there.  And then I went to Turkey.  Through Turkey I went

9   to Syria.  When I --

10          THE COURT:  Stop.

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Are you working for anybody at this

13   point?

14          THE DEFENDANT:  No.  No, sir.  No.  They said, "We

15   can't -- we can pay you only cash," basically.

16          THE COURT:  So did they give you the cash?

17          THE DEFENDANT:  No, no, no, no.  I --

18          THE COURT:  So why did they help you go at all?

19          THE DEFENDANT:  They didn't help me.  I left on my

20   own.

21          THE COURT:  Okay.

22          THE DEFENDANT:  Yeah.  Because they -- they were

23   help -- trying to help me take a flight, but they -- it just

24   took too long, and I couldn't -- I couldn't stay longer because

25   I didn't have enough money.  My money -- all my money was there

```
 1   and I could not stay longer.

 2            So I went there.  And when I went there, I only

 3   stayed five days in Deir ez-Zor, in the city.

 4            THE COURT:  Where?

 5            THE DEFENDANT:  Deir ez-Zor.

 6            THE COURT:  I don't --

 7            THE DEFENDANT:  Deir ez-Zor.  It's east --

 8            THE COURT:  Deir ez-Zor?

 9            THE WITNESS:  Yes, sir.

10            THE COURT:  D-E-R-E-Z-O-R?

11            THE DEFENDANT:  D-I-E-R-A-L-Z-O-R [sic], I believe.

12            THE COURT:  And that's in Syria?

13            THE DEFENDANT:  Yes.  That's east of Syria.

14   Basically, it's the -- which -- it's a province or you can say

15   city attached to the border with Iraq.

16            THE COURT:  Okay.

17            THE DEFENDANT:  Yeah.  It's desert, most likely.  And

18   I went there five days.  I stayed with a company called

19   Alkarma.  It's a Free Syrian Army company.  But --

20            THE COURT:  How do you spell that?

21            THE DEFENDANT:  Alkarma?  A-L-K --

22            THE COURT:  -- A-R-A-M-A?

23            THE DEFENDANT:  A-L-K-A-R-M-A.  Alkarma, yeah.

24            THE COURT:  So these are still the Syrian fighters?

25            THE DEFENDANT:  The Free Syrian Army.
```

```
 1                 THE COURT:  The army that wants to kill Assad?

 2                 THE DEFENDANT:  Yes, sir.  But it's too complicated

 3       there to the point it's --

 4                 THE COURT:  You can't tell who the good guys are and

 5       the bad guys are?

 6                 THE DEFENDANT:  Yes, sir.  Yes, sir, you cannot.

 7       Because when I went -- when I went there, I seen a lot of

 8       things through the cook.  I had to sleep in the room with the

 9       cook, the cook of the company, which the company is just like a

10       few people, really.  20 people, probably.  And they're all

11       relatives, like cousins and brothers.

12                 THE COURT:  In the army?

13                 THE DEFENDANT:  They call theirself Free Syrian Army.

14       Some of them didn't even serve --

15                 THE COURT:  Some of them really weren't even in the

16       army?

17                 THE DEFENDANT:  They were never in the army.  They

18       just --

19                 THE COURT:  But all of them hate Assad?

20                 THE DEFENDANT:  Yes, exactly.  And they basically --

21                 THE COURT:  And this is after Assad had gassed, I

22       guess is the right term, all those children and women.

23                 THE DEFENDANT:  Yes.

24                 THE COURT:  Right?

25                 THE DEFENDANT:  And when you see the city there,
```

1   there's no wall standing.  Nothing.  It's a hole.  And even

2   when I was there, it's a lot of mortar comes, and artillery

3   rounds come down on the city.

4          THE COURT:  Okay.  So why in the world are you

5   injecting yourself into this war zone?

6          THE DEFENDANT:  It's my heart, sir.  I was -- I was

7   crying every time I see it on the YouTube and see the people

8   crying to the media, putting their kids -- and the kid's head

9   is like this.  He's -- he's dead or -- and someone -- I could

10  not, sir.  I could not.  I am -- I'm sorry, but I'm a human.  I

11  had to do something.  I can't -- I see a dog -- ask -- ask my

12  wife.  If I see -- I save animals.

13         THE COURT:  Where was your wife during all of this?

14         THE DEFENDANT:  She's home.

15         THE COURT:  Here in Dallas?

16         THE DEFENDANT:  Yes, sir, in Mesquite.

17         THE COURT:  So you decided to be a one-man,

18  fix-the-world kind of army, go over there and fix everything in

19  Syria?

20         THE DEFENDANT:  I fought with my heart, sir.  I

21  mean --

22         THE COURT:  You understand that's not the smartest

23  thing?

24         THE DEFENDANT:  No, no.  No, sir.  No, it's not smart

25  thing.  And I --

1          THE COURT:  Do you have any children?

2          THE DEFENDANT:  And I'm sorry.

3          Yes, I am -- I have.  I have 15-year-old daughter.

4          THE COURT:  You understand that it looks more like

5     you're going over there to do bad things by the facts?

6          THE DEFENDANT:  No, sir.  I'm -- I was trying to go

7     to help, to stop a dictator and his -- his --

8          THE COURT:  I get that.  And I know people did go

9     from here over there to do that.  I understand that.  And then

10    we didn't send any armies.  Do you remember that?

11         THE DEFENDANT:  Yes, sir.  Yeah, that --

12         THE COURT:  We said we would, and there's a big

13    argument and some congressmen and some senators said, "Oh, yeah

14    let's do that," McCain and Lindsey Graham and some other

15    people.

16         THE DEFENDANT:  Even McCain, sir, he went inside

17    Syria, actually.

18         THE COURT:  I remember.

19         THE DEFENDANT:  So -- so even the FBI agent told me,

20    with our side, because that's -- Free Syrian Army, we support

21    them.  Even he said the Free Syrian Army leader, he lives here

22    in Dallas.  That's exactly his words.  So I didn't see nothing

23    wrong with going and help.

24         But when I got there, sir, I found out it's not like

25    what it looked in the -- on the media.  It's completely

1    different.  It's so complicated.  And Free Syrian Army is not

2    as I seen it on the TV.  They start cooperating -- because of

3    lack of ammunition, lack of money, they started cooperating

4    with those extremist groups and fight alongside and

5    cooperating.  And they start doing things, I mean, according to

6    the cook.  I really didn't see.  I was sitting with the cook

7    the whole time, the five days in the room.  So --

8              THE COURT:  So they went from being Freedom Fighters

9    to going, "Hey, we're not getting any help from the United

10   States, and we're going to get the help from ISIS and we're

11   going to kill Assad"?

12             THE DEFENDANT:  Unfortunately, that's the situation,

13   what happened in there.  The people said -- I mean, that's how

14   they start thinking, as "Hey, we're getting killed regardless,

15   so we've got to defend ourselves even if we sided with the

16   devil."  That's basically what happened there.

17             THE COURT:  Okay.  I kind of remember that all going

18   down, you know, on the news and everything.

19             So here's my question.  What in the world were you

20   doing when you started tweeting something?

21             THE DEFENDANT:  Sir, when that happened -- when I see

22   that -- when I seen that, this is not my place and this is not

23   my war, and I left because I did not agree with anything in

24   there.

25             THE COURT:  So how did you get out of there?

```
 1              THE DEFENDANT:  I got out of there -- I asked them to
 2    take me back to the border so I can go back, and they actually
 3    did.  They took me, because they were going back and forth to
 4    Turkey.  The border is really completely open.  They don't even
 5    ask you about paper or anything.
 6              So we got stuck there for like five days, but then we
 7    crossed and from there --
 8              THE COURT:  You went into Turkey?
 9              THE DEFENDANT:  Yes, sir.
10              THE COURT:  How far is that?  100 miles?  200 miles?
11              THE DEFENDANT:  I really don't know, but it was --
12              THE COURT:  I mean, can you get there in one day?
13              THE DEFENDANT:  Oh, yeah.  Yes.  It's probably three,
14    four hours.
15              THE COURT:  By car?
16              THE DEFENDANT:  Yes, by car.  But you have to know
17    that even with the car you have to go some certain ways
18    because --
19              THE COURT:  Roundabout ways because --
20              THE DEFENDANT:  The army, yes.
21              THE COURT:  Yeah, I get all that.
22              So when did you -- what did you do?  Did you get to
23    Istanbul, or did you fly home?
24              THE DEFENDANT:  Yes, I went to -- yes, I went to
25    Turkey, and then I went -- I went actually also to -- from
```

1   Turkey I went to Iraq but not to Baghdad.  I went to Kurdistan

2   only, trying to help my mom to find house, because that's where

3   we bought house.

4           THE COURT:  Your mom is in Kurdistan?

5           THE DEFENDANT:  My mom, she's Kurd.  She's a Kurd.

6           THE COURT:  So is she Christian?

7           THE DEFENDANT:  No, she wasn't, but she's Kurd.

8   Kurd.  I'm sorry.

9           THE COURT:  Kurds aren't Muslim.  Kurds are Christian

10  Muslims.

11          THE DEFENDANT:  No, sir.  No, sir.

12          THE COURT:  Aren't most of them Christians?

13          THE DEFENDANT:  Kurd?

14          THE COURT:  Yeah.  A lot of them are.

15          THE DEFENDANT:  No, Kurd, sir --

16          THE COURT:  They're all Muslim?

17          THE DEFENDANT:  90 percent.  At least 90 percent

18  Muslims.

19          THE COURT:  And they're very pro-American, right?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Kurds?

22          THE DEFENDANT:  Yes, sir.  Yes, sir.

23          THE COURT:  In fact, that's the only good part of

24  Iraq.

25          THE DEFENDANT:  That's --

1          THE COURT:  They fight against all the bad guys.

2          THE DEFENDANT:  Right.

3          THE COURT:  And it's flourishing.  They have oil.

4          THE DEFENDANT:  Yes.

5          THE COURT:  Real businesses.  Good things going on?

6          THE DEFENDANT:  Right.

7          THE COURT:  Right?

8          THE DEFENDANT:  That's why we decide to buy house

9    there, because --

10          THE COURT:  Instead of Baghdad?

11          THE DEFENDANT:  We have house in Baghdad, but that

12   was big family house, but we want safe haven, because my mom --

13   her --

14          THE COURT:  So what town in Kurdistan did you buy a

15   house?

16          THE DEFENDANT:  Sulaymaniyah.  That's where my mom is

17   from.

18          THE COURT:  Sulaymaniyah?

19          THE DEFENDANT:  Sulaymaniyah.

20          THE COURT:  Okay.

21          THE DEFENDANT:  It's Sulaymaniyah.  It's Kirkuk,

22   Erbil, and this Sulaymaniyah, the one east of --

23          THE COURT:  Is it a pretty big town?  Pretty big

24   city?

25          THE DEFENDANT:  It's only three main cities.  It was

```
 1    one of them, which is where the president is from.
 2              THE COURT:  Okay.  So, anyway, the president of
 3    Kurdistan?
 4              THE DEFENDANT:  I think --
 5              THE COURT:  Or there was a Kurdistan.  There's not,
 6    really.  I mean --
 7              THE DEFENDANT:  I think -- I don't know if he's --
 8              THE COURT:  It's a part of Iraq.
 9              THE DEFENDANT:  I think he's died now.
10              THE COURT:  Maybe.
11              THE DEFENDANT:  He died.
12              Yeah.  So after -- after that, sir, I went to Turkey
13    and --
14    BY MR. HYDE:
15    Q.   Where did you go from Turkey?
16    A.   From Turkey, actually I was in touch with girlfriend, you
17    can say, in --
18              THE COURT:  Oh, so you're cheating on your wife
19    during all of this, right?
20              THE DEFENDANT:  She's not really my wife.  We're not
21    really.  But I was just -- we were breaking up, basically.  We
22    were breaking up.  We had --
23              THE COURT:  Whatever.
24              So you were with another woman?
25              THE DEFENDANT:  I was talking to two womans, yes,
```

1    sir.  So I went to Finland to meet her.

2            THE COURT:  Where?

3            THE DEFENDANT:  Finland, Helsinki.

4            THE COURT:  Sweden?

5            THE DEFENDANT:  Right beside Sweden.

6            THE COURT:  Finland?  Finland?

7            THE DEFENDANT:  Yeah, Finland, right beside Sweden.

8            So I went there and stayed a couple of days, and then

9    I -- she -- her son, blah, blah, blah, he didn't want no one,

10   this and that.  It didn't work out.  So I went back.  I went to

11   Sweden.  I have relatives there.  And I stayed there south of

12   Stockholm.  I can't remember the name of the city.

13           But when I arrived at Stockholm, I went to the U.S.

14   Embassy, and I told them everything.  I told them this is what

15   happened, this is where I went, and this is what I seen, and

16   this is what I heard.  "And if y'all want me to help, I can go

17   back, because it's easier now because these people can get me

18   in as well, the Free Syrian Army.  If y'all want me to help, I

19   can help you again."

20           And so they said, "Well, since you're already in

21   touch with the FBI, go back and talk to the FBI."

22           THE COURT:  In America?

23           THE DEFENDANT:  Yeah.  So, actually, I called the FBI

24   agent from here.

25           THE COURT:  Mr. Lawrence?

1          THE DEFENDANT:  Yes.  I called him, and I told him

2     this and that and I want to go back home.

3          THE COURT:  So he helps you come back home?  Yes or

4     no.

5          THE DEFENDANT:  Yes, sir.  Yes, sir, he did.

6          THE COURT:  Okay.

7          THE DEFENDANT:  So --

8          THE COURT:  I don't want to put words in your mouth.

9     I'm just trying to do this faster instead of it taking ten

10    hours to get it out of you.

11         THE DEFENDANT:  I'm sorry, sir.  Yeah, I'm sorry.

12         So, yes, he did help me, and I came back here.  So --

13         THE COURT:  So when do we get to the tweets?

14         THE DEFENDANT:  Yeah.

15    BY MR. HYDE:

16    Q.   That's where we --

17    A.   Yeah.

18    Q.   So I want you --

19    A.   When I came back --

20    Q.   I want you to explain to the Judge, because the Government

21    came and ultimately did a search warrant on your computer.

22    A.   Yeah, yeah.

23    Q.   And I'm sure Mr. Penley will ask you about videos or

24    things that are on there, but explain to the Judge why you

25    would have been following ISIS videos or tweet and retweet.

1    A.    It's not ISIS, though.  It's everything that's going on in

2    Syria.

3    Q.    Right.

4    A.    Yeah.

5    Q.    But why you would have had any interest or support for

6    al-Baghdadi.

7    A.    I have no interest and no support at all.

8          I don't want to say that word, but I will say I only

9    tried to make them mad.  Because what they do there, the Shia

10   and Sunni, the war between Sunni and Shia, it took everywhere,

11   physically on the ground, and it start even on the social

12   media.

13         They put on the social media everything that's -- I

14   don't say that word -- get the Sunnis mad.  Okay.  They post

15   things that --

16   Q.    There's a --

17         THE COURT:  ISIS is Shia; isn't that right?  ISIS is

18   Shia?

19         THE DEFENDANT:  No.  No.

20         MR. HYDE:  Sunni.

21         THE DEFENDANT:  ISIS --

22         THE COURT:  Is it Sunni?

23         THE DEFENDANT:  It's basically -- it's all the

24   Sunnis, yes, include the ones in Iraq and Syria.

25         THE COURT:  A lot of guys that used to be in the Iraq

```
 1  Army; isn't that right?  A lot of them are now in ISIS; isn't
 2  that right?
 3          THE DEFENDANT:  As they said, yes, a lot of -- a lot
 4  of -- what people said, yes, they are generally probably --
 5          THE COURT:  So remind me, is Syria mostly Shia or
 6  mostly Sunni?
 7          THE DEFENDANT:  Huh?
 8          THE COURT:  Syria.
 9          THE DEFENDANT:  Yes, sir.
10          THE COURT:  Mostly Shia?
11          THE DEFENDANT:  No.  Mostly Sunni, sir.
12          THE COURT:  Mostly Sunni?
13          THE DEFENDANT:  85 percent of them are Sunnis.
14          THE COURT:  Okay.
15          THE DEFENDANT:  And that's exactly where they form.
16  They form from the Sunnis, the tribes.  The tribes.
17  BY MR. HYDE:
18  Q.  So he understands --
19  A.  I have --
20  Q.  No.
21  A.  Yes.
22  Q.  Listen to my question.
23  A.  Yes, sir.
24  Q.  So that the Judge understands, your own websites were the
25  Sunnis and Shias are in a verbal confrontation --
```

```
 1   A.   Yes, yes.

 2   Q.   -- back and forth in social media; is that correct?

 3   A.   Yes, sir.  That's everywhere, Facebook, Twitter, YouTube.

 4   They curse each other.  They -- can I say?  That's the only way

 5   to make sense to me.

 6            THE COURT:  Okay.

 7   A.   They piss each other off like by posting things here.

 8            THE DEFENDANT:  I'm sorry, I'm not trying to be

 9   disrespectful, but that's the only word that makes meaning to

10   me.  And they put --

11            THE COURT:  So you post something and side with which

12   side?

13            THE DEFENDANT:  I always try to piss the Shia off,

14   yeah, get them mad, as they do the same thing here.

15            They post, "Hey, look at the Sunni woman.  We -- they

16   are cut" -- how do you say?  Captive?

17            MR. HYDE:  Capitate?

18            THE DEFENDANT:  Captives.  And, look, we can use them

19   for both, to breed, which is sexually assaulted, and to cook

20   for our soldiers and this and that.  And they post a lot of

21   things, a lot of things.

22            They beheaded innocent Sunnis, and, "Oh, this --

23   look, this is" --

24            THE COURT:  Okay.  So then you post what?  That's the

25   problem here.
```

```
 1              THE DEFENDANT:  Huh?
 2    BY MR. HYDE:
 3    Q.   You posted that you supported --
 4    A.   I actually not support nothing.  Any tweet, any something
 5    that can make them mad -- because they come to us, well, in
 6    that conversation and start --
 7    Q.   He understands.  He's asking you, tell him what was
 8    tweeted.
 9    A.   Oh, it was -- it was a tweet.  It was a tweet by one of
10    the Sunni people, which is that's what they do, tweet about
11    pledge to the leader, Al-Halif, basically.  That doesn't
12    mean -- they don't -- they don't consider him as really, but
13    just to piss them off.  Said, "I pledge allegiance to the Halif
14    of Muslims, and where are you supporter?"
15              Basically, it's so obvious, the tweet, come here,
16    retweet it so we can piss them off.  Because when they do, they
17    start blocking that account and report it so it will be --
18    basically, the Sunnis and Shia block each other so Twitter can
19    basically remove that account.  That's how they do.
20              THE COURT:  Okay.
21              THE DEFENDANT:  I have no --
22    BY MR. HYDE:
23    Q.   But as far as any actions or anything against the United
24    States --
25    A.   Sir, I love my country.  I gave my life.  I gave -- I put
```

1    my family, myself.  And my family always, always supported me

2    and encouraged me to do that.

3              I did more than a lot of people who born here.  And

4    what did I do against my country?  Nothing completely.  I'm

5    just trying because we have really that war between Sunni and

6    Shia.  It's been for 1400 years, sir.  1400 years since --

7              THE COURT:  Yeah, I understand that.  I know that

8    part.

9              THE DEFENDANT:  I have nothing against my country.

10   Nothing at all.  As a matter of fact, I always try to help.

11             THE COURT:  So what did you say in your tweet?

12             THE DEFENDANT:  Actually, sir, that's not -- yes, I'm

13   sorry.  Actually, that's not my tweet.  It was a tweet by

14   someone.  What I did --

15             THE COURT:  You retweeted?

16             THE DEFENDANT:  I copy-pasted.  Copy-pasted.

17             THE COURT:  Is that --

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Does the Government agree with that, by

20   the way?  Is that --

21             THE DEFENDANT:  I copy-pasted.

22             THE COURT:  He retweeted something somebody else did,

23   or did he do it on his own?

24             MR. PENLEY:  Your Honor, I don't agree to that.

25             THE COURT:  Oh, okay.  I will hear from you in a

 1 | minute.  Okay.

 2 |         MR. PENLEY:  The post -- the Government's position is

 3 | his post was retweeted by other people.  That's my

 4 | understanding.

 5 |         THE COURT:  He was the original?

 6 |         MR. PENLEY:  That's my understanding, Your Honor.

 7 |         THE COURT:  I'm not a tweeter, so I don't really

 8 | understand that.

 9 |         THE DEFENDANT:  Okay.

10 |         THE COURT:  But what he's saying, that it was not his

11 | original tweet.  I guess we'll find that out in a minute.

12 |         THE DEFENDANT:  Sir, I did not tweet it like I type

13 | it, but I copied the whole sentence and pasted.  Yes, it show

14 | that I tweeted, but actually I copy-pasted.

15 |         THE COURT:  Somebody -- a computer can tell us that.

16 |         THE DEFENDANT:  Yes, sir.  But I might -- I might

17 | correct a spelling.  That's what shows that I tweeted.  But my

18 | intention only, sir, to piss them off.  That's all.

19 |         I want -- if I want to have something, I won't go on

20 | the media, sir.  I would -- why would I go on the media?  I'm

21 | trying to piss them off.  I even don't even have my name or

22 | anything, just putting picture and different name.

23 |         So just between Sunnis and Shia.  It has nothing to

24 | do with my country at all, sir.  I'm not trying to do anything.

25 | And that's why when they come, they have -- they have nothing.

```
 1              Did they find anything that is bad in my possession,

 2    like a gun, explosive, something, or anything?  No, sir.

 3    Because I would never do anything.  I love my country.  I love

 4    my people.  I can -- I went there to protect people.  Come back

 5    to hurt people?  That's not true.

 6              THE COURT:  Well, but you also made a little trip

 7    over to Finland to have this affair with that girl.  You

 8    weren't doing all -- you know, you're not the X-Man or

 9    something traveling around the world.  You're also kind of over

10    here kind of cheating on your wife, doing some other stuff.

11              MR. HYDE:  I don't think he's legally married.

12              THE COURT:  You weren't legally married?

13              THE DEFENDANT:  No, no, no, no.

14              THE COURT:  All right.

15              THE DEFENDANT:  I call her my wife, common-law wife.

16              THE COURT:  But either way, you weren't just over

17    there as a Freedom Fighter.  You were over there to have a

18    little -- little relationship going on up there --

19              THE DEFENDANT:  No, sir.

20              THE COURT:  -- in Helsinki, right?

21              THE DEFENDANT:  No, sir.  I was --

22              THE COURT:  Yes, you did.

23              THE DEFENDANT:  Huh?

24              THE COURT:  Yes.  You already told me that.

25              THE DEFENDANT:  Yes, sir.  Yes.  But I was breaking
```

1  up with her.  Breaking up with her --

2          THE COURT:  Whatever.

3          THE DEFENDANT:  -- at the time.

4          THE COURT:  You weren't over there just being a

5  Freedom Fighter.  You were kind of going around the world

6  finding women to have relationships with, correct?  Yes or no.

7          THE DEFENDANT:  Sir, yes, I -- I -- I --

8          THE COURT:  Thank you.

9          THE DEFENDANT:  I -- I --

10          THE COURT:  Thank you.

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  I mean, come on, let's be straight up

13  about it.

14          THE DEFENDANT:  I'm sorry.  I'm sorry, sir.  I'm

15  sorry.  I'm sorry.

16          THE COURT:  I mean, do you understand how stupid it

17  sounds that you went back to Syria?

18          THE DEFENDANT:  Yes, sir.  I am so sorry.

19          THE COURT:  You have family, you have children, you

20  have a woman that for whatever reason is willing to stick with

21  you.  This was the woman you were with before, right?  And her

22  name is, what, Barbara?

23          THE DEFENDANT:  Yes, sir.  I am going to marry her.

24          THE COURT:  Yeah.  Whatever.

25          THE DEFENDANT:  No, that's -- that's --

1          THE COURT:  So if you get another chance, are you

2     going back to Syria?

3          THE DEFENDANT:  No.  No, sir.  No, no.  I love my

4     family.  I want to be with my family.  I want to be with my

5     daughter.

6          THE COURT:  Yeah, but just out of the blue when you

7     start seeing bad things, you jump, went to Mexico, made every

8     effort to get back over there, even though you weren't at that

9     point working with the CIA or the FBI or the Army or anybody

10    else, on your own going to be a Freedom Fighter, right?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Yeah, that's --

13         THE DEFENDANT:  I want to --

14         THE COURT:  That doesn't make a lot of sense.  Do you

15    understand that?

16         THE DEFENDANT:  I'm sorry, I didn't get that.

17         THE COURT:  I mean --

18         THE DEFENDANT:  I'm sorry.  I'm sorry.

19         THE COURT:  You were here in the United States.

20         THE DEFENDANT:  Yes.

21         THE COURT:  We were kind enough to give you a

22    citizenship.  Mercy, the most valuable thing that we have here,

23    our freedom.  And you decide to go back to that hell hole of

24    the Middle East.  I know it's your home, but I don't care what

25    anybody says about it, it is the most dysfunctional place in

 1    the world.

 2              THE DEFENDANT:  Right, sir.  And I regret that.

 3              THE COURT:  It's almost hard to tell who the -- who

 4    the players are.

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  Who are the good guys, the bad guys.  And

 7    now Russia is involved.

 8              THE DEFENDANT:  Yes.  That's why I left, sir.  That's

 9    why I didn't stay there.  And I regret that.  All these 13

10    months I've been in prison, I cry every night.  And I'm sorry.

11              THE COURT:  Okay.  Well, crying is not going to help.

12    Right now, I just need --

13              THE DEFENDANT:  I'm sorry.

14              THE COURT:  -- to get really good information out of

15    you.

16              Okay.  So let me make sure I get what you retweeted.

17    Your position is you retweeted.  Let me make sure I look at

18    that.

19              MR. PENLEY:  Your Honor, if I may, it's at the bottom

20    of page 5 of the PSR, paragraph 19.

21              THE COURT:  Okay.

22              MR. PENLEY:  It starts on -- the sentence begins, "On

23    June 19, 2014."

24              THE COURT:  Here's what you -- you say retweeted and

25    the Government said you tweeted -- "I pledge allegiance to the

1    Caliphate Abu Bakr al-Baghdadi."

2              He's the big hotshot head of ISIS, right?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Still is.  We haven't been able to kill

5    him yet, right?

6              THE DEFENDANT:  Yes, sir.  I don't know about that.

7              THE COURT:  We killed the head of Taliban over in --

8              THE DEFENDANT:  Yeah.

9              THE COURT:  -- Afghanistan, but we haven't caught

10   this guy.  In fact, I think they're attacking in the city where

11   he is today.  Is it Racaba?  I can't remember the name.  So

12   maybe -- maybe we're going to go back and do that red line

13   thing President Obama promised.  Maybe we're going to do that.

14   Maybe I can ask him that.  I would like to.

15             "Here we renew our pledge to the Caliphate Abu Bakr

16   al-Baghdadi come on supporter where is the pledger."

17             And let's see.  Another one.  "Advice from Sheikh

18   al-Hatari."  Who is that?

19             THE DEFENDANT:  Probably someone on Facebook.

20             THE COURT:  No, don't give me that probably.  You

21   wrote it.

22             THE DEFENDANT:  I don't know him exactly, but I

23   know -- I know that was one of --

24             THE COURT:  Is he another big guy in ISIS?

25             THE DEFENDANT:  No, no.  No, sir.  No, sir.  He was

```
 1    one of the Sunnis who always talk about the Shia.
 2              THE COURT:  Is he a mullah?
 3              THE DEFENDANT:  Mullah?
 4              THE COURT:  Yeah.  Is he a head -- a religious man,
 5    or is he --
 6              THE DEFENDANT:  No, he's not that.  He's just a speak
 7    man, basically.  Spokesman.
 8              THE COURT:  Spokesman?
 9              THE DEFENDANT:  Yeah.
10              THE COURT:  "To the elders of Al-Qaida God save
11    them."
12              So was he an Al-Qaida?
13              THE DEFENDANT:  Huh?
14              THE COURT:  Is he an Al-Qaida?
15              THE DEFENDANT:  No.  No, sir.
16              (Pause)
17              THE COURT:  Okay.  And what -- I want to make sure
18    I've got the -- let me look at the indictment again.
19              MR. PENLEY:  Your Honor, it's the superseding
20    indictment filed on July 21st.
21              THE COURT:  Yes, sir.  I have it.  Thank you.  Thank
22    you.  Thank you.
23              (Pause)
24              THE COURT:  So really it's just lying to the FBI,
25    right?
```

```
1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  The same charge that -- let's see.  Lots

3   of people have been caught on this particular charge.  I'm

4   trying to remember right now the fellow's name that was the

5   Dick Cheney's chief of staff.

6              MR. HYDE:  "Scooter" Libby.

7              THE COURT:  "Scooter" Libby.  The same charge.

8              Okay.  So it's lying to the FBI, which is usually --

9   that's kind of where we get these kind of cases.  If we can't

10  get you on something else, we're going to get you on this.

11  That's sort of the end-of-the-road kind of deal on FBI charges,

12  it seems to me, you know.  But it is what it is.

13             Did you lie to the FBI?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  What did they ask you?

16             THE DEFENDANT:  They asked me how am I going to

17  Syria.

18             THE COURT:  You lied about going to Syria, didn't

19  you?

20             THE DEFENDANT:  Yes, sir.  I'm sorry.

21             THE COURT:  You told them you didn't go?

22             THE DEFENDANT:  Huh?

23             THE COURT:  You told them you didn't go?

24             THE DEFENDANT:  No, no, no.  I actually told them I

25  went.  No.  When they stopped me at the airport, they asked me
```

```
 1    am I going to Syria.
 2              THE COURT:  Oh, you lied about going?
 3              THE DEFENDANT:  Yes, going.  But I --
 4              THE COURT:  You admit that today?
 5              THE DEFENDANT:  But then --
 6              THE COURT:  You just weren't part of terrorism is the
 7    difference, right?
 8              THE DEFENDANT:  I admitted actually three, four days
 9    later when they took me to the Mesquite department.
10              THE COURT:  Okay.
11              THE DEFENDANT:  Police department.
12              THE COURT:  So what you're -- what you're saying is
13    and what your case today is, I didn't go there to promote
14    terrorism.
15              THE DEFENDANT:  No, sir, not at all.
16              THE COURT:  That's the difference, correct?
17              THE DEFENDANT:  Yes, sir.  I'm not.
18              THE COURT:  Is that right, Mr. Hyde?  Am I getting
19    your gist --
20              THE DEFENDANT:  Yes.
21              THE COURT:  -- of your defense?
22              MR. HYDE:  Yeah, I believe that's right, but I also
23    think that when they asked him about the tweet that he --
24              THE COURT:  Oh, he lied about the tweet, too?
25              MR. HYDE:  Right, right.
```

1            THE DEFENDANT:  Yes.  The --

2            THE COURT:  You said you didn't send that tweet?

3            THE DEFENDANT:  Sir --

4            THE COURT:  Just yes or no.

5            THE DEFENDANT:  Okay.  Yes, sir, I lied.

6            THE COURT:  Okay.  So those are the two things he

7    lied about?

8            MR. HYDE:  Yes, sir.

9            THE COURT:  You gave them some story, right?  You

10   told something else that wasn't true?

11           THE DEFENDANT:  I told them I am going -- which is --

12   I --

13           THE COURT:  About the tweet.

14           THE DEFENDANT:  Oh, the tweet, sir, they didn't ask

15   me am I -- did I tweet this.  They said, "Did you pledge?"

16           I even -- it is --

17           THE COURT:  They said, "Did you pledge allegiance to

18   al-Baghdadi?"

19           THE DEFENDANT:  Right.  That's exactly how they asked

20   me.

21           THE COURT:  I mean to ISIS.

22           THE DEFENDANT:  And to my understanding, sir -- to my

23   understanding --

24           THE COURT:  And you answered what?

25           THE DEFENDANT:  I said no.

1              THE COURT:  Okay.

2              THE DEFENDANT:  Because that's --

3              THE COURT:  But the words speak for themselves.

4              And what your defense is, I was really just trying

5   to -- I'm not going to use your words -- to make ISIS angry?

6              THE DEFENDANT:  Make them mad, sir.

7              THE COURT:  Make the Shia --

8              THE DEFENDANT:  Shia.  Shia.  Yes.  Shia.

9              THE COURT:  Not ISIS angry --

10             THE DEFENDANT:  No, no.

11             THE COURT:  -- but Shia angry?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  Okay.  Okay.  I kind of get it.  It's a

14  little convoluted.  This is a little unusual.  I think we would

15  all agree on that, except for you.  It kind of seems like this

16  is your -- you would say this is sort of normal, going back

17  here.  "I'm going to walk into a place where my friend was

18  beheaded."  I don't get it.

19             The most dangerous -- I guess Syria is arguably the

20  most dangerous country in the world, short of the border that

21  we have here, here in Texas.  You know, the hundred miles

22  between Nuevo Laredo and Piedras Negras is the most dangerous

23  place in the world.  But other than that, you know -- you

24  notice I'm a little bit -- I'm not too excited about people

25  that threaten our country.

1            THE DEFENDANT:  I'm not, sir.  I'm not.  I would

2    never do -- I would never do.

3            THE COURT:  I mean, it makes -- it makes almost no

4    sense that you wouldn't value freedom the way we value freedom.

5    You value the fight between Shias and Sunnis more than you

6    value freedom here in America.  That's the strangest thing I've

7    ever seen.  I don't get it.

8            THE DEFENDANT:  Sir --

9            THE COURT:  I do not get that culturally.  Do you

10   know what I'm saying?

11           THE DEFENDANT:  Sir, God knows my heart.

12           THE COURT:  Do you get it?

13           THE DEFENDANT:  Sir, God knows my heart.

14           THE COURT:  I agree, God knows your heart, but God is

15   not here today.  I'm just a poor judge trying to decide what

16   your heart is.  I agree God knows, knows yours and mine and

17   everybody here, but I've got to figure it out.  Do you

18   understand that?

19           THE DEFENDANT:  Yes, sir.  Yes, sir.  Yes, sir.  Yes,

20   sir.

21           THE COURT:  Okay.  So your position is, "I'm just

22   this crazy, mixed-up guy that did something stupid"?

23           THE DEFENDANT:  I did stupid things.

24           THE COURT:  Is that right?

25           THE DEFENDANT:  Yes, sir.  I regret it, and I am so

 1    sorry.

 2            THE COURT:  I mean, I -- let me tell you, I agree

 3    with you.

 4            THE DEFENDANT:  I will be sorry the rest of my life.

 5            THE COURT:  I agree that you are -- that this was a

 6    stupid thing to do.

 7            THE DEFENDANT:  I am.  I know, sir.  I did.  I did

 8    very stupid things, and I regret it.

 9            THE COURT:  Okay.  All right.  Is there anything

10    else?

11            MR. HYDE:  I think that's all I have.

12            THE COURT:  Do you want to cross him?

13            MR. PENLEY:  Your Honor, may I ask just a few

14    questions?  I know we're long on time.

15            THE COURT:  Yeah.  A few.  It's your right.

16            MR. PENLEY:  I'll just try to clarify a couple of

17    issues, Your Honor.

18            THE COURT:  Okay.  Great.  Make sure to keep your

19    voice up.

20            MR. PENLEY:  Very well, Your Honor.

21                        CROSS-EXAMINATION

22    BY MR. PENLEY:

23    Q.   Mr. Abood?

24    A.   Yes.

25    Q.   I'm Mark Penley.  I'm the prosecutor on the case for the

```
 1 │ United States Government.
 2 │ A.   Yes, sir.
 3 │ Q.   Mr. Abood, you testified that you joined the U.S. Army.
 4 │ Did you complete basic training?
 5 │ A.   Yes, sir.
 6 │ Q.   And how long were you in the Army total months?
 7 │ A.   Probably five months.
 8 │ Q.   Five months.
 9 │        And when you left, did you get an honorable discharge
10 │ or a general discharge?
11 │ A.   General discharge.
12 │ Q.   Okay.  You didn't get an honorable?
13 │ A.   No one can get honorable unless you finish six months.
14 │        THE COURT:  Talk into the microphone.
15 │        THE DEFENDANT:  Oh, sorry.
16 │ A.   Sir, you have to finish --
17 │ Q.   Did you get an honorable discharge?
18 │ A.   You have to finish six months.
19 │ Q.   Did you get an honorable discharge?
20 │ A.   You have -- yes.  No, sir.
21 │        THE COURT:  No.
22 │        THE DEFENDANT:  No, sir.
23 │        THE COURT:  No.  Just answer no.
24 │        THE DEFENDANT:  Oh, no, no.  No, sir.  General.
25 │ BY MR. PENLEY:
```

1   Q.   You tried to fly directly to Syria from DFW International

2   Airport in, I believe, early April of 2013; is that correct?

3   A.   April 2013?

4   Q.   Yes.

5   A.   It was March.

6   Q.   Late March?

7   A.   Yes, late March.

8   Q.   All right.  And you were questioned by federal law

9   enforcement agents at the airport, correct?

10   A.   Right.

11   Q.   You were not allowed to fly because you were on the no-fly

12   list?

13   A.   Right.

14   Q.   Correct?

15   A.   Right.

16   Q.   And you told those federal agents that you were just going

17   to Iraq to visit your family, correct?

18   A.   Yes, sir.

19   Q.   So you were telling a lie at that time, weren't you?

20   A.   Yes, sir.

21   Q.   And it was later when you talked to them in Mesquite you

22   finally told them that you really intended also to go to Syria

23   and get involved in the fighting over there?

24   A.   Yes, sir.

25   Q.   And they told you that was a bad idea and that you

1  shouldn't go?

2  A.   No, sir.

3  Q.   And then later you were still on the no-fly list, and the

4  way you left the country was by bus to Mexico where you caught

5  a flight to the Middle East, correct?

6  A.   Yes.

7  Q.   That's how you got yourself to Turkey and then Syria,

8  correct?

9  A.   Yes, sir.

10 Q.   All right.  So you were warned not to go.  You went --

11 A.   No, sir.

12 Q.   -- anyway?

13 A.   No, sir.

14 Q.   And you weren't straight with the federal agents the first

15 time you talked to them at the airport, were you?

16 A.   No, sir.  Actually, they -- sorry.

17         But, I mean, the agent actually told me to --

18 encouraged me to go.  "You are with our side.  You're fighting

19 with the Free Syrian Army, and we might need your help," so --

20 Q.   Mr. Abood --

21 A.   Yes, sir.

22 Q.   -- let me ask my next question, please.

23 A.   Yes, sir.

24 Q.   If you'll listen to me.

25 A.   Yes, sir.

1    Q.   You testified about ISIS, and you said ISIS wasn't that

2    active in Syria when you were there --

3    A.   Right.

4    Q.   -- in the summer of 2013?

5    A.   Right, sir.

6    Q.   You would agree with me, wouldn't you, that by a year

7    later, the summer of 2014, ISIS was on the march, not only in

8    Syria but into Iraq?

9    A.   Right.

10   Q.   The summer of 2014 is when ISIS made world headlines,

11   isn't it?

12   A.   Okay.  Yes, sir.

13   Q.   That's when they went out of Syria and conquered part of

14   Iraq, correct?

15   A.   I believe so.

16   Q.   Okay.  So they were certainly in the news when you posted

17   your tweet on June 19, 2014, and said -- I quote -- "I pledge

18   allegiance" -- or "I pledge obedience to the Caliphate."

19         Now, the Caliphate is an Islamic state that radical

20   Muslims want to establish, correct?

21   A.   Not necessarily.  No, sir.

22   Q.   Well, what do you think the Caliphate is?

23   A.   Well --

24   Q.   What does ISIS say the Caliphate is?

25   A.   Oh, ISIS --

```
 1    Q.    Let's ask that.
 2    A.    -- ISIS is radical.  Yes, I understand that part.
 3    Q.    ISIS is radical?
 4    A.    Yes, sir.
 5    Q.    And the Caliphate in their view --
 6    A.    Yes.  It's radical, yes.
 7    Q.    -- is an Islamic state they will set up?
 8    A.    Yes, sir.  Yes, sir.
 9    Q.    And they will run it under Sharia law, correct?
10    A.    Yes, sir.  That's --
11    Q.    And there's no religious liberty --
12    A.    No.
13    Q.    -- in their Caliphate?
14    A.    No, sir.  No, sir.
15    Q.    There are no women's rights in their Caliphate?
16    A.    No, sir.
17    Q.    There is no respect for human rights in the Caliphate run
18    by ISIS, is there?
19    A.    No.  No, sir.
20    Q.    And I heard you testify that you were upset by things
21    going on in Syria because women were being raped --
22    A.    Yes, sir.
23    Q.    -- and people were being murdered.
24                Are you aware that ISIS rapes women by the hundreds
25    and thousands?  Are you aware of that?
```

1    A.    No, sir.

2    Q.    Are you aware that ISIS murders people by the thousands?

3          Are you aware that ISIS has no regard for human

4    rights?  You don't know that?

5    A.    I know.  I know that.  I don't understand what --

6    Q.    Did you see on the news where they burned a captured pilot

7    alive?

8    A.    No, I didn't see that.

9    Q.    Did you see on the news where ISIS fighters in Libya took

10   Egyptian Coptic Christian men that they captured who were

11   working in Libya to support their families, they took them out

12   on the beach and they beheaded them?  Did you -- do you know

13   that?

14   A.    No, sir, I didn't know.

15   Q.    Do you know about the captured journalists and human aid

16   workers from the west that were trying to help the people of

17   Syria who were captured by ISIS and were beheaded?

18   A.    Yeah, I think I see.  I heard that, yes, sir.

19   Q.    So you knew that and yet you tweeted obedience to the

20   leader of ISIS, Abu Bakr al-Baghdadi?

21   A.    No, sir.  I --

22   Q.    And do you know that Abu Bakr al-Baghdadi is a specially

23   designated global terrorist by the United States Government?

24   A.    Yes, sir.

25   Q.    And the U.S. Army and the U.S. Government gave you the

1   privilege to come here and become a citizen, correct?

2   A.   Yes, sir.

3   Q.   And you swore an oath of loyalty to the United States when

4   you received your citizenship --

5   A.   Yes, sir.

6   Q.   -- didn't you?

7   A.   Yes, sir.  And still.

8   Q.   And yet you're pledging loyalty to an organization that is

9   barbaric, that murders innocent people by droves, and yet you

10  claim you're loyal to the United States?

11  A.   No, sir, I did not pledge.

12        MR. PENLEY:  And, Judge, I'll wrap it up.

13  BY MR. PENLEY:

14  Q.   Let me ask you this.

15  A.   Yes, sir.

16  Q.   Sir, you talked about your interactions with the FBI?

17  A.   Yes, sir.

18  Q.   When the FBI agents talked to you in 2013, especially

19  after you came back from Syria, and on into 2014 and even into

20  2015, you knew they wanted to know about your activities and

21  what you were really up to, didn't you?

22  A.   I'm sorry, can you repeat that?

23  Q.   When the FBI questioned you, you knew they were concerned

24  about your activities and your motivations, correct?

25  A.   Right.

1  Q.   And you knew they were concerned to find out whether you

2  were involved in terrorism; isn't that true?

3  A.   When they questioned me when?  Where?

4  Q.   All during that time, 2014, 2015.

5  A.   Because they -- they came to me -- no, I don't think so.

6  That was not the case, no.

7  Q.   You knew that you had to tell them the truth, didn't you?

8  A.   I -- I should tell them the truth.  I tell them I go to

9  Syria, and I did.

10  Q.   They warned you when they interviewed you that you had to

11  tell them the truth under the law, correct?

12  A.   In Mesquite Police Department, that's what -- yes, that's

13  when I -- I told them the truth, "I'm going to Syria.  I have

14  intention to go to Syria, but I'm not so sure."

15  Q.   Mr. Abood, this is a yes-or-no question.

16  A.   Yes, sir.

17  Q.   When the FBI questioned you in 2014 and '15, they warned

18  you that you had to tell the truth or you would break the law.

19  That's a yes-or-no answer.

20  A.   Yeah.  Yes.  I believe so.

21  Q.   Okay.  And when they asked you if you had pledged

22  allegiance to Abu Bakr al-Baghdadi, who's a specially

23  designated global terrorist, you knew you were supposed to tell

24  them the truth under United States law, didn't you?

25  A.   Yes, I do.

1    Q.   And you lied anyway, didn't you?

2    A.   Sir, I did not pledge.  That's the point.

3    Q.   You lied to them when you denied making that statement,

4    didn't you?

5    A.   Sir --

6    Q.   Let me ask a different question.

7         Your Twitter handle is ibn, i-b-n, alislaam --

8    A.   Right.

9    Q.   -- at --

10   A.   Yes, sir.

11   Q.   And your e-mail address is albaghdady_1978@hotmail.com,

12   correct?

13   A.   I think so, yes, sir.

14   Q.   And you know that the FBI executed a search warrant on

15   your apartment.  They seized your computer, they searched it,

16   and they found this.  You know it was in your computer, don't

17   you?

18   A.   I -- as I said, sir, I copy-paste a lot of tweets by going

19   between Sunnis and Shia.  So I actually -- when they said did I

20   pledge -- when it comes to my mentology, it's like I've been

21   with ISIS and I pledge to them like I did here with the Army.

22   No, no.

23        So if they -- if -- it's -- to me, I'm not pledging.

24   I -- I copy-paste tweet whatever can make them mad, to make the

25   Shia mad.  That's all.

1      MR. PENLEY:  Your Honor, I have no further questions.

2      THE COURT:  Thank you, sir.

3      Anything else?

4      MR. HYDE:  Your Honor, I just want to clarify one

5   thing about the timeline about '14 and '15, because I think the

6   reports and I think even the PSI reflect that September the

7   16th of 2013 he met with an agent and described the events in

8   Syria as he understood them and gave information and phone

9   numbers to the FBI.

10      Time goes by, and there's no contact until July the

11   9th of 2014.  So nearly a year.  Ten months.

12      A search warrant was issued for his computers, and

13   then they wait another ten months.

14      And April the 14th of 2015, they come back and

15   recontact him and bring his computer back, and shortly

16   thereafter was arrested.

17      So there was quite a bit of period from '13 to '15

18   where there really wasn't much contact.

19      THE COURT:  Okay.  Anything else?

20      MR. PENLEY:  Your Honor, I just have some things to

21   argue and point out to the Court from the record.

22      THE COURT:  Sure.  Sure.

23      MR. PENLEY:  But no other questions.

24      THE COURT:  Do you want to proffer anything or --

25      MR. PENLEY:  Your Honor, basically I just want to

 1    talk about some of the pleadings.

 2              THE COURT:  Did he really talk to an FBI agent named

 3    Lawrence?  I mean, is there some -- such a human?

 4              MR. PENLEY:  He did, Your Honor.  Yes, sir.

 5              THE COURT:  Okay.

 6              MR. PENLEY:  Yes, sir.

 7              THE COURT:  So that was true?

 8              MR. PENLEY:  In fact, he's here with me today.

 9              THE COURT:  Oh, okay.

10              MR. PENLEY:  Yes.  He's the case agent, Your Honor.

11              THE COURT:  I'd kind of like to talk to him.  I don't

12    really care what y'all want.  I want to call him and talk to

13    him.

14              MR. PENLEY:  Very well.  I'll call him.

15              THE COURT:  If you'll get on the witness stand,

16    please.

17              MR. HYDE:  Your Honor, do you want us to sit at the

18    table?

19              THE COURT:  Yeah, y'all sit down.

20              Raise your right hand and be sworn.

21              (The witness was sworn)

22              THE COURT:  Take a seat, please, sir.

23              THE WITNESS:  Yes.

24              THE COURT:  Thank you for being here.

25

```
 1              RYAN LAWRENCE, GOVERNMENT'S WITNESS, SWORN

 2                        DIRECT EXAMINATION

 3         THE COURT:  And your name is?

 4         THE WITNESS:  Ryan Lawrence.

 5         THE COURT:  All right.  And you do know the Defendant

 6  today?

 7         THE WITNESS:  Yes, I do, sir.

 8         THE COURT:  Oh, I'm sorry.  It's so loud.

 9         Ronnie, get that under control.

10         Back up just a little bit.

11         He said he came and talked to you about going to

12  Syria and you offered him cash, all that story.  Tell me about

13  that.  Is that true or not?

14         THE WITNESS:  Sir, so we interviewed him at

15  Mesquite -- we interviewed him at the Mesquite Police

16  Department, at which point he was asked about his intentions to

17  go to Syria.

18         THE COURT:  Back up just a hair, okay?

19         THE DEFENDANT:  Okay.  Okay.  Oh, off the microphone?

20  Got it.

21         THE COURT:  Yes, sir.  That's what I meant.  Thank

22  you.

23         THE WITNESS:  Okay.  Interviewed him at the police

24  department.  At first he said he was just going to go home to

25  Iraq like he told me at the airport previously.  And then --
```

1          THE COURT:  You've still got to be in front of the

2     microphone.

3          THE WITNESS:  And then he mentioned that --

4          THE COURT:  You hear yourself, is how you know that

5     you're -- but it's not going to be like this where you're --

6     (making sound)

7          THE WITNESS:  Okay.

8          THE COURT:  Okay.  Here we go.

9          THE WITNESS:  And then he mentioned that he had -- we

10    had his luggage, and then we asked, "Do you need that for

11    Iraq?"

12          And he was like, "Well, I was going to go into Syria

13    to fight.  And then he came clean on that.

14          So at that point we are trying to continue to assess

15    is this guy a potential threat to the United States.

16          So at the end we asked, "Okay.  We want to continue

17    to assess what kind of situation we're dealing with here.  Can

18    we continue to talk to you?"

19          He agreed, at which point we left Mesquite.  We drove

20    him back home to his girlfriend's location, Ms. Strbeck.

21          He called me a few days later, stating, "I can't stay

22    here.  I can't live with this woman.  I want to leave," at

23    which point the FBI was continuing its assessment of him.

24          So try and buy us more time to complete our

25    assessment, the FBI placed him in a hotel, at which point three

1   or four days the FBI concluded that this individual was someone

2   that we felt there was a terrorist threat from and someone we

3   should not have a relationship with --

4           THE COURT:  Okay.

5           THE WITNESS:  -- the kind he's mentioning.

6           THE COURT:  Did you talk about this cash or that sort

7   of thing with him about, "We would like for you to go and we

8   will pay you cash" and all that, or no?

9           THE WITNESS:  No, sir.

10          THE COURT:  That didn't happen?  None of that?

11          THE WITNESS:  No, sir.  What happened was "Are you

12  willing, if needed and we asked, to perhaps do something for

13  the United States Government?"  And that was it.

14          And then he said yes.

15          And we said we have to go and assess what -- where we

16  would like to go from here, because in the back of our mind,

17  knowing the scope of the investigation, the Government did not

18  know what exactly -- how to handle him at that time.

19          I will say this as well.  He was down in San Antonio.

20  When he left Dallas, he went to San Antonio for 30 days.  And

21  he's calling me, trying to figure out about the no-fly list.

22  And the Government is trying to work on what can we do to

23  figure out what exactly is going on with this individual.

24          I called him and said, "The Government, you do not

25  have a relationship with us.  I strongly recommend you do not

1  go into Syria.  I strongly recommend you stay in the U.S. and

2  live your life.

3          And he's like, "Oh, no, sir.  When I leave, I'm just

4  going to go to Iraq to find and meet with my family."  And

5  that's what he said.

6          THE COURT:  Okay.  But at some point you weren't sure

7  if he's a good guy or bad guy?

8          THE WITNESS:  At that time --

9          THE COURT:  And I know I'm oversimplifying it, but

10  I'm just -- I'm just a poor old guy from Irving, Texas.  I'm

11  not an FBI agent.

12          THE WITNESS:  At the time when I told him, "We

13  recommend you do not leave the U.S., you stay here."

14          THE COURT:  I didn't ask you that.

15          THE WITNESS:  "Do not go into Syria."

16          THE COURT:  I didn't ask you that.

17          THE WITNESS:  Okay.

18          THE COURT:  At some point you weren't sure whether he

19  was a good guy or bad guy?  Yes or no.

20          THE WITNESS:  At some point, yes, sir.

21          THE COURT:  And so you were trying to assess that?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  And there was some discussion about maybe

24  letting him work for you or you were just using that as a ploy

25  to find out whether he's a good guy or bad guy?

1          THE WITNESS:  That was used for both reasons, to see

2     if we wanted to have a relationship and to determine -- give us

3     more time to determine if he was a good guy or a bad guy.

4          THE COURT:  So maybe, if he had been -- if you

5     determined he was a good guy --

6          THE WITNESS:  Uh-huh.

7          THE COURT:  -- you might have used him and had him go

8     back to the Middle East and do something again, maybe?

9          THE WITNESS:  Maybe.

10          THE COURT:  Okay.  I realize there's a lot of

11     speculation going on there, but I'm trying to understand this

12     conversation you had with him.

13          Let me get your assessment of him.  Wouldn't you say

14     he's definitely a character, I mean, an odd character?  I mean,

15     not many people would want to even consider doing what he's

16     doing.

17          THE WITNESS:  Yes, I would say he's the minority of

18     those who would do that.

19          THE COURT:  Yeah.  I mean, you get a chance to come

20     and live in the United States, but you're going to go back to

21     one of the worst places in the world.  I mean, it's awfully

22     strange, I mean, it seems to me.  I mean, it's his home, but

23     even so, it just seems awfully strange to me.

24          But we use folks like that, the Government does, if

25     they're useful to trying to stop terrorism over in the Middle

```
 1    East.  I'm assuming that.  Yes?
 2              THE WITNESS:  Yes, sir.
 3              THE COURT:  Okay.  Do you understand it's a little
 4    hard -- I'm assuming you had the same trouble I'm having today
 5    to read him.  I mean, his speech is a little odd.
 6              THE WITNESS:  Uh-huh.
 7              THE COURT:  He's an odd character.  And it's hard to
 8    assess him.
 9              THE WITNESS:  Uh-huh.
10              THE COURT:  It took you a while, correct?
11              THE WITNESS:  Yes, sir.
12              THE COURT:  You see what I'm saying?  I'm not trying
13    to sneak up on you.  I'm just trying to say it's hard to know
14    what's going on in his head.
15              THE WITNESS:  Yes, sir.
16              THE COURT:  Do you see what I'm saying?
17              THE WITNESS:  Yes, sir.
18              THE COURT:  Okay.  So really what he lied to y'all
19    about is, one, he lied about the tweet and what he said, and he
20    lied about going to Syria after he told -- he said he didn't go
21    to Syria.  That's right?  Those are the two big things?
22              THE WITNESS:  No, he told me -- he told me that he
23    did go to Syria.  He lied about his intentions to travel to
24    Syria prior --
25              THE COURT:  That's what I meant.
```

1          THE WITNESS:  -- to going, yes, sir.

2          THE COURT:  So he lied about -- I misspoke.  I'm

3    sorry.

4          And then the second thing he lied about was all this

5    stuff he put on his computer and tweeting about what he did,

6    and he told you, "I didn't do that."  Is that what happened

7    or --

8          THE WITNESS:  He said he did not make those

9    statements, sir.

10          THE COURT:  Okay.  Okay.  And then you found it on

11    the computer and caught him, correct?

12          THE WITNESS:  Sir, we knew --

13          THE COURT:  Somebody found it on the computer?

14          THE WITNESS:  Yes.

15          THE COURT:  Okay.  Okay.  Or you had already looked

16    on the computer and knew he had said that and he denied it?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  So you had him cold, correct?

19          THE WITNESS:  Yes, sir.  We already knew he made

20    those statements, and then we asked him about it, and then he

21    was dishonest.

22          THE COURT:  Okay.  So if he had told you the truth,

23    you would have prosecuted him as being a terrorist?

24          THE WITNESS:  Sir, it's my job to investigate and

25    find the facts.

```
1              THE COURT:  I didn't ask you all that.  I know what
2    your job is.
3              THE WITNESS:  Okay.
4              THE COURT:  It's my job to ask you questions --
5              THE WITNESS:  Yes, sir.
6              THE COURT:  -- and everybody else.
7              THE WITNESS:  Yes, sir.
8              THE COURT:  Do you understand that?
9              THE WITNESS:  Yes, sir.
10             THE COURT:  Some of them are easy on people.  Some of
11   them aren't, even the FBI agents.
12             THE WITNESS:  Yes, sir.
13             THE COURT:  Do you understand that?
14             THE WITNESS:  Yes, sir.
15             THE COURT:  So you would have prosecuted him for
16   something either way?  Yes or no, you would have prosecuted
17   him, right?
18             THE WITNESS:  DOJ would make that determination.
19             THE COURT:  You would have recommended it?
20             THE WITNESS:  I would have recommended it.
21             THE COURT:  The FBI makes the recommendation.
22             THE WITNESS:  Yes, sir.
23             THE COURT:  Right now, the FBI is making some big
24   decisions of whether they're going to recommend prosecution of
25   some really high-profile people in our country running for
```

1    president, right?  The FBI makes the recommendation.

2              THE WITNESS:  Yes, sir, the FBI makes the

3    recommendation.

4              THE COURT:  The Justice Department makes the

5    decision.

6              THE WITNESS:  Yes.

7              THE COURT:  That's Mr. Penley over there.  But you

8    make the recommendation, you being the FBI, right?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Okay.  But you would have recommended

11   prosecuting him either way?  Yes or no to that answer.

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.  That's what I thought.

14             So we kind of had him in a Catch 22 at that point,

15   right?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  His best bet would have been to call

18   Mr. Hyde and say, "I don't think I'm going to answer that

19   question," would have been the lawyer -- now I'm putting my

20   lawyer hat on.

21             Are you a lawyer or an accountant?

22             THE WITNESS:  I'm a military officer.  I am neither.

23             THE COURT:  You were a what?  A military officer?

24             THE WITNESS:  Yes, intelligence officer.

25             THE COURT:  Okay.  A what?  I'm sorry.

1           THE WITNESS:  Intelligence officer, U.S. Navy.

2           THE COURT:  Okay.  Okay.  What else do I need to know

3   about him that you want me to know about him?

4           THE WITNESS:  Sir, he's shown a pattern of

5   deceitfulness the entire time I've known him since I first

6   encountered him in March 2013.  He likes to stretch the truth,

7   he likes to withhold, and he's all about mitigation.

8           THE COURT:  Okay.

9           THE WITNESS:  No matter what he has done, he will

10  find a way to mitigate it.

11          THE COURT:  Okay.

12          THE WITNESS:  He's made comments about caring about

13  women and children.  I'm aware that that's -- from what I've

14  seen, that's not completely accurate.

15          THE COURT:  He didn't stay very long in that war

16  zone, did he?

17          THE WITNESS:  No, sir.  But as we had in our filings,

18  he was -- he had mentioned he was trying to go back eventually.

19          THE COURT:  Even again?

20          THE WITNESS:  Yes, sir.  After he had came back to

21  the U.S., he mentioned that -- he said the Government helped

22  him come back.  Well, the Government allowed him to fly on a

23  plane because the Government was concerned about him getting

24  into the U.S. illegally crossing a border and --

25          THE COURT:  So you did actually help him get back?

```
 1                THE WITNESS:  His girlfriend, the one he cheated on,
 2      sent -- he asked her for the money, and she paid -- she paid
 3      for him to fly back.
 4                THE COURT:  But you made it okay for him to get off
 5      the no-fly zone -- no-fly list?
 6                THE WITNESS:  He was given a one-time downgrade, one
 7      time.
 8                THE COURT:  Oh, you can get a onetime --
 9                THE WITNESS:  He got a onetime downgrade for that.
10      And at that point we were concerned --
11                THE COURT:  I didn't know you could do that.  You can
12      do a onetime --
13                THE WITNESS:  That's what the Government did.
14                THE COURT:  That's interesting.
15                THE WITNESS:  And what -- and the reason we did that
16      was we were concerned about him coming back illegally via
17      Mexico or Canada --
18                THE COURT:  Sure.
19                THE WITNESS:  -- and not knowing where he was at.
20                THE COURT:  Sure.  That makes sense.  I get it.
21                Y'all have any questions you want to ask to clear all
22      this up?
23                MR. PENLEY:  No, Your Honor.
24
25
```

1                           CROSS-EXAMINATION

2     BY MR. HYDE:

3     Q.    Yeah, I just have one quick question.

4           Is there anything about his military background to

5     suggest that he was viewed as a threat when he was working for

6     the military that you know of?  Obviously, that would have been

7     a background check that y'all were looking into.

8     A.    As a former military officer working with Special Forces,

9     Navy SEALS, I am quite aware -- although I am not a SEAL, I

10    participated in training evolutions with them.  I have seen

11    tactics.  This individual went to a U.S. Army boot camp.  They

12    have access and training to weapons and everything else.

13          Per his own account, he also spent time overseas with

14    Special Forces, so he's seen U.S. tactics and has been around

15    military-type thinking and professionals like that for the last

16    five, seven years.

17    Q.    So if he had really had a desire to hurt the United

18    States, he would have had ample opportunity in the roles and

19    positions he had been in before?

20    A.    He had time here, yes.

21    Q.    Okay.  And in regards -- when he came back and y'all

22    downgraded him and allowed him to get back here, y'all didn't

23    consider him a real big threat just based on the time lapses.

24    Even after the search warrant on the computer it was nearly a

25    year before coming back and getting him.  Y'all didn't consider

1    him a real major threat?

2    A.   I disagree.  The investigation continued.

3    Q.   Okay.

4             THE COURT:  You didn't keep him under constant

5    surveillance, did you?

6             THE WITNESS:  He was being monitored, sir.

7             THE COURT:  What does that mean?

8             THE WITNESS:  Well, surveillance, yeah.

9             THE COURT:  So he was under 24-hour surveillance?

10            THE WITNESS:  Well, we had surveillance on him

11   intermittently, but the main thing as we talked about --

12            THE COURT:  What does that mean?

13            THE WITNESS:  Intermittently?

14            THE COURT:  You drove by?  No, I know what

15   intermittently --

16            THE WITNESS:  Oh, I'm sorry.

17            THE COURT:  I mean, did you drive by?  What did -- I

18   need a little more definition.  That's like when -- that's

19   officer speak.

20            THE WITNESS:  Okay.

21            THE COURT:  It's like when officers say the suspect

22   exited the vehicle.  That means he got out of the car.

23            THE WITNESS:  Uh-huh.

24            THE COURT:  I just want to know what does

25   intermittently mean to you.  Does that mean y'all drove by ever

1   so often?

2           THE WITNESS:  Uh-huh.

3           THE COURT:  You called him ever so often?

4           THE WITNESS:  Uh-huh.

5           THE COURT:  What does that mean?

6           THE WITNESS:  We have surveillance teams who at times

7   would do surveillance of his activities.  Also, per our filing

8   documents we had an FBI employee who had daily contact with him

9   online.

10          THE COURT:  On typing online on the computer?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Okay.  So, of course, that could have

13  been -- you wouldn't know the locale of his computer.  I mean,

14  he could have been doing it at other locations?

15          THE WITNESS:  Well, he's telling that individual

16  where is he at and what is he doing, and that's how we're

17  monitoring that.

18          THE COURT:  Well, but I could lie about that if I

19  wanted to, couldn't I?

20          THE WITNESS:  That is true.

21          THE COURT:  Okay.  I mean, you could ask me that and

22  I could be in Seattle instead of Dallas.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Okay.  So -- but, I mean, you weren't as

25  concerned about him enough to be out there every day or even

1   have a leg monitor on him?

2            THE WITNESS:  We were not out there every day, and

3   there was no leg monitor.

4            THE COURT:  And you didn't put a camera up on a pole

5   and put it in front of the house to see when he left and went;

6   is that right?

7            THE WITNESS:  We did have a camera up.

8            THE COURT:  All the time?

9            THE WITNESS:  I don't remember the exact dates, but I

10  know it was when -- after he returned from Syria.

11           THE COURT:  And it was on all the time?

12           THE WITNESS:  I don't remember the exact timeline,

13  sir.  I don't.

14           THE COURT:  But you were watching him all the time or

15  you recorded it or -- I'm --

16           THE WITNESS:  I was not watching all the time, no.

17           THE COURT:  But you watched him some?

18           THE WITNESS:  Yes.

19           THE COURT:  In front of his house or apartment?

20           THE WITNESS:  It was an apartment building.  Yes,

21  sir.

22           THE COURT:  And you could see when he left, if you

23  wanted to?

24           THE WITNESS:  From the camera angle, we could not see

25  the exact door.  I know our surveillance teams use --

1          THE COURT:  Could you see where his car was or

2     something?

3          THE WITNESS:  Yeah.  Like, there was a green truck

4     that his wife or girlfriend --

5          THE COURT:  So if he left in the truck, that's what

6     you were kind of monitoring?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.

9          THE WITNESS:  The entrance.

10         THE COURT:  I get that.

11         Okay.  What else?

12    BY MR. HYDE:

13    Q.   And besides the tweets that y'all asked him about and

14    used, did there -- any other actions besides that to indicate

15    he was involved in any terroristic activity?

16    A.   Well, he made numerous statements against the U.S. online

17    with the FBI employee he was talking to.

18    Q.   Okay.

19    A.   All that has been documented in the -- in our court

20    filings.

21    Q.   And none of those things rose to a level to be asked about

22    or -- as far as file any kind of charge or consider it material

23    against the United States?

24    A.   No, we asked him -- regarding some of those comments, we

25    asked him more questions regarding those comments as well, at

1    which he lied.

2    Q.   Okay.  Because the only one I know about is the one about

3    the tweet, so I -- yeah, I'm not --

4    A.   That's the one he pled to.

5    Q.   I don't know about any others --

6    A.   Yes.

7    Q.   -- so that's why I asked you that question.  Obviously,

8    they would consider that --

9             THE COURT:  Stop.

10            Do you have an objection?

11            MR. PENLEY:  Your Honor, I want to object to this

12   line of questioning as irrelevant because the issue is just

13   what he's pled to, and that's the one-count superseding

14   indictment, which is about the false statement regarding his

15   pledge of allegiance to Abu Bakr al-Baghdadi.  So other --

16   other statements and other investigation from my standpoint is

17   irrelevant.

18            THE COURT:  I agree.  I let you go a little far on

19   your line of questioning over here.  I'm going to let him go a

20   little far on what he was doing, okay?

21            MR. PENLEY:  I understand, Your Honor.

22            THE COURT:  But don't go too far.

23            MR. HYDE:  I don't have any other questions.

24            THE COURT:  Oh, it didn't go very far.  That's great.

25            MR. HYDE:  Yeah.

1          THE COURT:  That's wonderful.

2          Okay.  Thanks very much --

3          THE WITNESS:  Thank you.

4          THE COURT:  -- Agent Lawrence.

5          (Witness excused)

6          THE COURT:  All right.  Y'all -- brief argument.

7          MR. PENLEY:  Brief argument, Judge.

8          Judge, the issue before the Court as the Government

9    sees it is which statutory maximum will apply.

10          THE COURT:  Was it involving terrorism or not?

11          MR. PENLEY:  Exactly.  Is it five years or is it

12   eight years, because the guidelines are above them both.  And

13   we say it did involve international terrorism.

14          Number one, we've got a man who went to Syria.  The

15   Court heard Special Agent Lawrence testify that they were

16   trying to assess this individual to determine is he somebody

17   who's just talking noise or is he somebody who is preparing to

18   act, who wants to act, who's willing to act.

19          And, Your Honor, I will represent to the Court it's

20   my understanding from reading in this area that people who

21   pledge loyalty to these international terrorist groups or to

22   their leaders, it's one and the same thing.  In other words, a

23   pledge of loyalty to Abu Bakr al-Baghdadi is tantamount to a

24   pledge of loyalty to ISIS.

25          And, Your Honor, as the Court well knows, the FBI has

1   a very important docket of counterterrorism cases.  One of

2   their jobs, which they take very seriously, is trying to spot

3   people who may be preparing to take violent action inside the

4   United States, witness San Bernardino.

5           So when somebody like this pops up on the radar

6   screen, the agents have to try to assess is this a dangerous

7   individual.

8           THE COURT:  They have a tough job.  Let me say for

9   the record, trying to assess someone as complicated as this

10  individual, it's -- they have a tough job.  I'm glad it's not

11  my job.  I don't -- you know, it's a very hard job.  And I want

12  to tell them how much I appreciate what they're doing.

13          Agent Lawrence, don't misunderstand how much I

14  appreciate what you're doing.  It's very difficult.  Very

15  difficult.

16          MR. PENLEY:  And, Your Honor, that's why this false

17  statement that he admitted to in the factual resume -- he's

18  pled to Count One.  And if I could just read it for the record.

19  It gives the date, April 14, 2015, in the Northern District.

20          "The Defendant did knowingly and willfully make and

21  cause to be made materially false, fictitious, and fraudulent

22  statements and misrepresentations in a manner within the

23  jurisdiction of the Federal Bureau of Investigation which

24  involved international terrorism as defined in 18 U.S. Code,

25  Section 2331, by falsely stating to federal law enforcement

1    agents that he had never pledged allegiance to Abu Bakr

2    al-Baghdadi, the leader of ISIL."

3              That's what he's pled to.  That language in Count One

4    specifically says it involved international terrorism.

5              So, Your Honor, I humbly suggest to the Court that

6    that forecloses the issue on the sentencing enhancement being

7    applied.

8              THE COURT:  I understand that argument.

9              MR. PENLEY:  And I understand that's your decision to

10   make and not mine, but that's -- that's argument number one on

11   this issue.

12             Argument number two is the factual resume, Your

13   Honor.  Right here at the bottom of page 5 in the factual

14   resume he admitted that he was aware that the FBI agents were

15   investigating a matter which they suspected could involve

16   international terrorism.

17             So that gets back to what the Court and I were just

18   discussing about Special Agent Lawrence and his colleagues' job

19   of looking at people that pop up on their radar screen that

20   exhibit certain behaviors that they're concerned about.

21             THE COURT:  Right, trying to decide are they

22   goofballs that are never going to do anything or are these

23   people that are going to act.  I get it.

24             MR. PENLEY:  Exactly.  Exactly.

25             And it's a very -- it's a very important activity

 1    they're involved in, and it's very difficult.  So --

 2              THE COURT:  It is.  There's no doubt about it.

 3              MR. PENLEY:  And, obviously, Your Honor, one method

 4    of trying to assess somebody is talking to them in person.  And

 5    that's why, as Mr. Abood admitted, the agents warned him it's a

 6    crime if you lie to us.  It's a crime --

 7              THE COURT:  Well, in addition to this, I guess if he

 8    pleaded guilty to something it's he's certainly hardheaded in

 9    addition to that.  If we could have a second count of

10    hardheadedness, he's going to be guilty of that, too.

11              I mean, it didn't matter what Agent Lawrence told him

12    over and over and over again; he was going to do what he wanted

13    to do, yes, and he was going to go to Finland.  He was going

14    to do -- I mean, there's a lot of things that he shouldn't do,

15    but -- you know, it's interesting.  But, anyway --

16              Yeah, poor -- poor Agent Lawrence having to deal with

17    him.  I mean, my goodness.

18              But, anyway, go ahead.

19              MR. PENLEY:  Well, Your Honor, not to belabor the

20    point, but just looking at the record, what the Court has seen

21    in the PSR, he knew this was -- that the FBI was concerned

22    about him.  They were concerned about his activities.  They

23    were concerned about who he linked up with inside Syria.

24              The Court had some interchange with Mr. Abood about

25    what was going on in Syria in 2013.

1      THE COURT:  You know, he actually is reciting what we

2   all know the facts were back then.  And it is a very

3   complicated situation that our own government can't figure out.

4   The world can't figure out.  Apparently, only Russia can figure

5   out whose side they're going to be on, and it's -- it's the

6   dictator who's killing people.  Everybody is killing people

7   over there.  They're all bad guys.

8      I mean, you know, I know at least at some point we

9   wanted to try to help who were the supposed good guys over

10   there.  And, you know, it's -- you know, it's kind of a

11   difficult thing.  And he kind of recited that.  I agree with

12   that.  But that's not the point.  Today is, did he lie about

13   these other things.  He's admitted it.

14      MR. PENLEY:  Right.

15      THE COURT:  It's just whether it was terrorism.  And

16   I'll decide that.  I get it.  You've done a good job of helping

17   me know that.

18      MR. PENLEY:  My final point, Your Honor, once the FBI

19   knew he had gone to Syria and they allowed him to come back, as

20   Agent Lawrence said, so they knew where he was and could keep

21   an eye on him, they're concerned about people like that who

22   have been in a combat zone and who have possibly received

23   advanced training in things like explosives, IEDs, and all

24   other sorts of terrorism.

25      THE COURT:  I get all that, but there's no evidence

1    he was doing any of that.

2            MR. PENLEY:  No, that's not our claim, and that's not

3    what he pled to, and I'm not trying to interject that.  I'm

4    just trying to explain to you why --

5            THE COURT:  There's no evidence that he's built any

6    bombs, knows how to build any bombs.

7            I mean, the evidence is apparently he knows how to

8    cook.  He went and worked with a cook who was at the deal.  He

9    never went out and fought with the guys that were fighting.  He

10   was in there with the cook, is the evidence that I've heard

11   today.

12           MR. PENLEY:  Your Honor, what I'm trying to say is,

13   the FBI was continuing to watch him to see --

14           THE COURT:  And thank goodness he did.

15           MR. PENLEY:  -- if he was going to branch out into

16   something else.

17           THE COURT:  Sure.  Sure.  Was he going to do that,

18   that's -- that's the next step.  I agree.

19           MR. PENLEY:  Your Honor, that's all I have.

20           THE COURT:  Hey, thanks a lot, Mr. Penley.

21           MR. PENLEY:  Thank you, Your Honor.

22           THE COURT:  Mr. Hyde, is your client a goofball or

23   terrorist?

24           MR. HYDE:  Your Honor, I would say he's for sure

25   guilty of goofball, not a terrorist.

1          I think he obviously has made bad decisions; but if

2     he had wanted to do something against the United States, he had

3     ample opportunity to lead these guys through bad parts of Iraq,

4     being on military bases, being on military bases of the United

5     States.

6          Obviously, none of those guys are going to come today

7     and vouch for him in a United States court that he was a good

8     guy and they trusted him and worked with him.

9          THE COURT:  I'm assuming you made some efforts to try

10    to get that done and they all said no?

11         MR. HYDE:  I may have explored that, but I -- common

12    sense tells you they're not going to risk their jobs for

13    Mr. Abood and --

14         THE COURT:  After what he tweeted.

15         MR. HYDE:  Correct.

16         And I guess I just keep looking at obviously my

17    memorandum.  Words alone don't get us there as being material

18    as far as being involved --

19         THE COURT:  Let me stop you.  Is the young lady that

20    wrote me the letter -- and by the way, I have a number of

21    supportive letters that I'm considering.  Is she here today?

22    Is she here in the courtroom?

23         MR. HYDE:  No.  The letter is from his sister.

24         THE COURT:  That was from his sister.  No, I'm

25    talking about the lady that he's --

```
 1                MR. HYDE:  No.

 2                THE COURT:  -- that he's with.  She's not here today?

 3                MR. HYDE:  No.

 4                THE COURT:  Okay.

 5                MR. HYDE:  No.  And she was -- called me, got

 6    directions, so --

 7                THE COURT:  But she didn't show up?

 8                MR. HYDE:  Well, she's kind of scatterbrained.

 9                THE COURT:  Oh, really?

10                MR. HYDE:  Yeah.

11                THE COURT:  I'm kind of shocked.

12                MR. HYDE:  Yeah.

13                THE COURT:  These two got together?  Mercy.

14                MR. HYDE:  Yes, sir.

15                THE COURT:  Who would think?

16                MR. HYDE:  So with that being said and the fact that

17    they -- and everything you've said is right as far as how hard

18    it is, but at some point actions, I think, speak louder than

19    words.

20                THE COURT:  Aren't you glad that we're just lawyers

21    and we question people and give them a hard time and not Agent

22    Lawrence --

23                MR. HYDE:  Correct.

24                THE COURT:  -- who's right there behind Mr. Penley?

25                MR. HYDE:  And I'm glad Agent Lawrence is there,
```

1    but --

2            THE COURT:  I am, too.

3            MR. HYDE:  I think he made terrible mistakes about

4    lying, but I don't think that he did anything in furtherance of

5    promoting a terrorist act against the United States in his

6    actions.  And, again, I would argue, as I have in juries,

7    actions speak louder than words.

8            Obviously, he made a mistake about going to Syria to

9    begin with and it was stupid and everything you've described,

10   but with the exception of tweets on Arabic internet sites that

11   we wouldn't -- most people wouldn't even know was going on

12   unless you were a Sunni or a Shia -- thank goodness they

13   monitor them and see what's going on, but eight months later

14   they come back and say, "Hey, we want to talk to you about

15   something."  And there's nothing to indicate he wasn't

16   forthright about what he saw in Syria or unbelievable.

17           And I would just argue that, you know, him making

18   that statement is bad and stupid, but it doesn't get to the --

19   what I'll call the fifth prong, that it involved international

20   terrorism, and just ask that you sentence him in the range of

21   not telling the truth to the agent here when they had important

22   questions to ask him.

23           THE COURT:  Which would make the range what?

24           MR. HYDE:  Well, it --

25           THE COURT:  What?

```
 1              MR. HYDE:  It would be --

 2              THE COURT:  I think you've got that in your

 3   memorandum.

 4              MR. HYDE:  Based on the guidelines that I looked up

 5   and his criminal history, which would be none, he would be at

 6   an 11, I believe.

 7              THE COURT:  One and 11?

 8              MR. HYDE:  It would just be a -- let me get my cheat

 9   sheet here.

10              MR. PENLEY:  Your Honor, the guideline range is

11   calculated as 151 to 188 months.

12              THE COURT:  I know that.

13              MR. HYDE:  I'm talking about if there's no terrorism

14   prong.

15              THE COURT:  If there's not a terrorism prong.

16              MR. HYDE:  If it's just 1000 --

17              THE COURT:  You're just lying to an FBI agent.

18              MR. PENLEY:  I see.  I see.

19              THE COURT:  I don't mean "just."

20              PROBATION OFFICER:  Your Honor, I believe it would be

21   a total offense level of 12 with a criminal history category of

22   1.

23              THE COURT:  So 10 to 16?

24              PROBATION OFFICER:  10 to 16 months.

25              THE COURT:  Thanks.  Okay.  Hey, thank you.  I should
```

1    have asked the expert in the first place.  Thank you.

2            Let the record reflect that's the wonderful Probation

3    Department helping me figure this out.  That's why I like to

4    have y'all here.  Now you understand that.

5            Okay.  What else, Mr. Hyde?  Anything else?

6            MR. HYDE:  That's it.

7            THE COURT:  All right.  Let me just say I am

8    considering the guidelines, the factors of 3553(a).  I have

9    never sentenced anybody on this particular kind of case before,

10   so I can't compare it to that.

11           Now, with regard to the cap, I do agree with

12   Mr. Penley that I think it involved terrorism, and I think

13   that's what the plea involved, so I don't -- I don't agree with

14   that, so I do -- I would put that cap at 96 with regard to

15   that.

16           And let me just say that it's -- I've got to look at

17   really what he actually did here.  It is -- it's what he said

18   over the -- which is certainly abominable what he said in

19   tweets and that sort of thing and then lying about that.

20           People can believe those sort of things and can make

21   those kind of things.  You just can't lie to FBI agents about

22   that.  And that's what -- it offends me that he would pledge

23   allegiance like that.  It really does.  And I don't mind saying

24   that.  But I think people can -- as long as it's not violent,

25   they can have those kinds of beliefs and can tell people that

 1   sort of thing.

 2          Now, he did lie about both where he went and where he

 3   was going, and he lied about whether he had tweeted that or

 4   not.

 5          He has been helpful to the Government at certain

 6   points.  Obviously, he got rewarded for that.  I don't need to

 7   re-reward him for that.  Getting to be a citizen is a great

 8   thing.

 9          So do I -- I don't completely agree with the

10   Government, that I don't think it's that -- I don't think it

11   deserves that sentence, and so -- but I think it's more than

12   what you're saying, Mr. Hyde.

13          And it is the judgment of the Court --

14          You'll need to stand up, Mr. Abood.

15          -- that you be sentenced to the custody of the United

16   States Bureau of Prison --

17          MR. HYDE:  Do you want us to approach the podium?  Do

18   you want us to approach the podium or --

19          THE COURT:  No, you can stand right there.

20          MR. HYDE:  All right.

21          THE COURT:  -- the Bureau of Prisons for a term of 48

22   months.

23          I'll give you credit for the time you've served.

24          And I'm going to -- on top of that, you'll have to be

25   on supervised release for three years after that.

1        And as conditions, you'll have to pay a $100.00

2   special assessment.

3        I'm going to recommend you serve your time at

4   Seagoville and that as your conditions you not commit any other

5   crimes; not illegally possess any controlled substances;

6   cooperate in the collection of your DNA; not possess a firearm,

7   ammunition, destructive device, or any other dangerous weapon;

8   report in person to the Probation Office where you're released

9   from custody within 72 hours of release from prison;

10  participate in mental health treatment services and contribute

11  at least $20.00 a month for that.

12       You've got to do that.  You've got to get some mental

13  health treatment.  And it includes taking medications

14  prescribed by a physician -- licensed physician.

15       Mandatory drug testing, I'm not going to -- I don't

16  think you've got that issue.  I'm not going to put that in

17  there.

18       Provide any requested financial information.

19       And you're going to have to participate and comply

20  with the requirements of the computer, internet monitoring

21  program, and particularly the costs of that, at least $40.00 a

22  month.  And that includes allowing the probation officers to

23  come in and monitor your computers at all times where they --

24  at any time.

25       And you're not to remove or reverse-engineer any of

1    the things that I put on there to monitor that.  And permit

2    them to do the preliminary search prior to installing software

3    and then monitoring whether it's still operating properly.

4              And then as I said earlier, unannounced examinations

5    to make sure all that's going and see what you're up to on the

6    computer; and not access any Internet Service Provider account

7    or otherwise using somebody else's name, designation, or alias;

8    not use your computer other than the one that's authorized to

9    use without prior approval from the probation officer; not use

10   any software that would hide or alter or delete records of

11   where you've been on the computer.

12             And I'm barring you from going to any of those kind

13   of social networking sites involving Sunnis and Shias and

14   terrorism.  I don't mean you can't check on recipes and things

15   like that or what is the latest movie out of Iraq or something.

16   That's fine.  I'm not saying that.  But you can't be going onto

17   these terror sites that -- you know what they are.  And if I

18   knew what they are, I would say it today.  But I'm telling you

19   I want to make sure that the Probation Department monitors

20   that.

21             Now, on your superseding indictment I'm going to

22   dismiss your original indictment.

23             Is that what you want me to do?

24             MR. PENLEY:  Yes, Your Honor.  We want to --

25             THE COURT:  I'll dismiss that today.

 1              MR. PENLEY:  -- dismiss that.  And he's pled to the

 2    superseding.

 3              THE COURT:  And I'll recommend Seagoville if that's

 4    what you want me to recommend.

 5              Is that what you want me to recommend, Mr. Hyde?

 6              MR. HYDE:  Yes, sir.

 7              THE COURT:  Is that where you want him to stay?

 8              MR. HYDE:  Yes.

 9              THE COURT:  Is that where you are now?

10              MR. HYDE:  It is.

11              THE COURT:  It is where you are now, sir?

12              THE DEFENDANT:  Uh-huh.

13              (Discussion off the record between the Defendant and

14              his counsel)

15              THE DEFENDANT:  Yes.

16              THE COURT:  Yes?  Okay.

17              All right.  Any questions you want to ask me, sir?

18              (Discussion off the record between the Defendant and

19              his counsel)

20              THE DEFENDANT:  No.

21              THE COURT:  Okay.  Anything else from the Government?

22              MR. PENLEY:  Nothing further.

23              THE COURT:  Oh, let me say something else on the

24    record.

25              I want to thank the FBI for what they do.  Mercy, do

1   we send mixed signals to our law enforcement officers and

2   judges, too, but certainly our government of what we want y'all

3   to do with regard to terrorism and how far you're supposed to

4   go and not go and what you can do and can't do.

5          I just thank y'all for doing what you do and

6   appreciate it very, very much.  And I'm not second-guessing

7   what you're doing.  I don't mean to be doing that today.  I've

8   got to make a decision what I think is an appropriate sentence,

9   and I do that, and that's my job, so -- not a pleasant one, but

10  it is.

11         Okay.  Off the record.

12         (Discussion off the record)

13         (Hearing adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX
                                                      Further
2                  Direct  Cross  Redirect  Recross  Redirect

3    WITNESS FOR THE
     DEFENDANT
4
     ABIL ABOOD          7      54
5
                                                      Further
6                  Direct  Cross  Redirect  Recross  Redirect

7    WITNESS FOR THE
     GOVERNMENT
8
     RYAN LAWRENCE      66      77
9

10
     Court's ruling.......................................... 94
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6       WITNESS MY HAND on this 2nd day of June, 2017.

7

8

9

                             /s/Todd Anderson

10                           TODD ANDERSON, RMR, CRR

                           United States Court Reporter

11                           1100 Commerce St., Rm. 1625

                           Dallas, Texas  75242

12                           (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25